## BOSTON & P. R. CORPORATION v. UNITED STATES.

District Court, D. Massachusetts.
March 19, 1929.

No. 3307.

Arthur W. Blackman, of Boston, Mass., for plaintiff.

Frederick H. Tarr, U. S. Atty., and J. Duke Smith, Sp. Asst. to U. S. Atty., both of Boston, Mass.

BREWSTER, District Judge. This is an action brought under section 24, paragraph 20, of the Judicial Code, as amended (28 USCA § 41, par. 20), to recover $19,342.56, income and profits tax assessed upon the calendar year 1918.

The controversy arises over the amount of the invested capital for that year; the plaintiff claiming that it is entitled to an addition to its invested capital for 1918 to the amount of $2,170,000, or some lesser sum, on account of the joint and several obligations of the Old Colony Railroad Company and the New York, New Haven & Hartford Railroad Company, to pay the funded indebtedness of the plaintiff in said amount.

The case was submitted upon an agreed statement of facts, and the testimony of witnesses called by the plaintiff. I make the following findings of fact:.

1. Plaintiff is a Massachusetts corporation, with principal office at Boston. It was incorporated in 1831, and owns a railroad, the main line of which extends between Boston, Mass., and Providence, R. I.

2. Plaintiff's capital stock has been $4,000,000 since 1878, and all of it has been outstanding since that time, except 40 shares held in its treasury.

3. The plaintiff was very successful in the operation of its road. It put substantial sums into its property from earnings, and paid dividends in each year from 1835 to 1887, except 1855, which averaged 7.38 per cent.

4. On March 14, 1887, a very disastrous wreck occurred on plaintiff's line, the cost of which proved to be $1,180,000.

5. On October 26, 1887, a committee on behalf of plaintiff's stockholders informed the respective presidents of the Boston & Albany Railroad, the Old Colony Railroad Company, a railroad corporation hereinafter referred to as the Old Colony, and the New York, Providence & Boston Railroad that, up to November 1, 1887, it would be open to proposals for a lease of plaintiff's road. The statement of this committee outlined the points that any such proposal should cover. One of these points related to provisions for payment of *principal and interest of the debts* of the plaintiff, floating and funded. Another related to the amount to be paid in cash at the time the lease went into effect, to be distributed pro rata among the plaintiff's stockholders.

6. The proposition deemed most favorable was received from the Old Colony. One of the provisions of said proposition was that the principal and interest of the debt of the plaintiff was to be paid by the Old Colony as follows: The net debt (that is, the gross liabilities, less cash and receivables and materials on hand) to be funded; interest on the same to be paid by the Old Colony as accrued; and payment of the principal within the term of the lease to be provided for by the Old Colony, by sinking fund or otherwise.

7. The aforesaid offer of the Old Colony was duly accepted by the plaintiff, and a lease, dated April 7, 1888, was entered into, the term thereof being 99 years from and

after April 1, 1888. So far as material to this case, the provisions of the lease are as follows:

(1) Paragraph third:

"The lessee shall not assign this lease, nor underlet the whole or any part of the demised premises, except such portions thereof as may not be required by it for railroad uses, without the consent of the directors of the lessor. But if the lessee shall unite with, or sell, or lease its railroad to any other railroad corporation, it may assign this lease to the corporation formed by such union, or to the corporation to which it thus sells or leases, such corporation becoming, and the lessee remaining, liable upon the covenants thereof."

(2) Paragraph fifth:

"The lessee shall pay to the lessor, as rent for the demised premises, the sum of one hundred thousand dollars for each quarter in each year during the term of this lease, to wit: On the first day of July, the first day of October, the first day of January, and the first day of April, in each and every year (the first payment to be made on the first day of July, A. D. 1888), and at the same rate for any portion of a quarter, at the office of the treasurer of the lessee, in the city of Boston; and shall also pay to the lessor, during the first three (3) years of said term, the sum of ten thousand dollars ($10,000) per annum, in equal quarterly payments, on the same days as said rent is payable; and each and every year thereafter, during said term, the sum of three thousand dollars ($3,-000), in like manner, as and for the expense of preserving the organization of the lessor, as herein agreed to be preserved and kept up. And the lessee will, on the first day of May, 1888, pay to the lessor the sum of thirteen hundred thousand dollars ($1,300,000), and also a sum equal to five dollars ($5) per share upon its capital stock, as and for a dividend, out of the net earnings of the lessor up to the date of this lease. *The lessee shall also pay, as the same becomes due, the interest on the indebtedness of the lessor (a schedule whereof is hereto annexed), and upon such future indebtedness as shall be created for the purpose of paying such indebtedness and other existing obligations and liabilities of the lessor, in the manner herein provided, and to that end shall pay to the lessor such sums of money at such times as shall enable it punctually to meet such interest as the same becomes due.* And the lessee shall also pay all taxes and assessments, whether in the nature of taxes, now in being or not, of every description, national, state and municipal, or otherwise, upon the property, business, fran-

chises and capital stock of the lessor as the same shall be imposed or assessed, and shall at all times keep the lessor indemnified against the same during the term of this lease."

(3) Paragraph eleventh:

"The lessor hereby assigns, transfers and delivers to the lessee all its material and supplies, bills and accounts receivable, money and cash on hand to be by the lessee applied (at the value thereof to be fixed by appraisal), to the payment of the dividend herein agreed to be paid upon the capital stock of the lessor on the first day of May 1888, and to the payment of outstanding liabilities of the lessor. *The lessor shall issue bonds for periods not exceeding the longest allowed by law, and at a rate of interest as low as practicable, for such sums as may be necessary to fund all its outstanding liabilities which are not thus paid, including the expense of defending and adjusting all claims and suits against the lessor, arising in the past use and operation of the demised premises, or of any railroad operated by the lessor, which bonds shall, at the request of the lessee, be extended as they mature for periods not exceeding the unexpired term of this lease on the most favorable terms then practicable.*

*"To provide for the payment of the net indebtedness of the lessor as thus ascertained and funded, the lessee shall, within six months after the same is thus approximately ascertained, and not later than January 1, 1890, establish a sinking fund in the hands of three trustees, appointed and maintained by its directors from their own number, and shall make such annual or more frequent payments thereto as may be necessary, with interest at four per cent. per annum, compounded semiannually, to cause it to meet said indebtedness during the term of this lease. And the lessee hereby agrees that such sinking fund shall be adequate to pay, and shall pay, said indebtedness at its maturity, as thus funded and extended, and that it will make up any deficiency therein. All bonds thus issued shall be certified by the lessor and lessee as issued under the provisions of this lease."*

(4) Paragraph thirteenth:

"If this lease shall be terminated within the demised term of ninety-nine years without fault of the lessee, the lessor shall pay the lessee a proportional part (having regard to the unexpired portion of the lease and other circumstances) of its indebtedness which may have been funded by the lessor and paid by the lessee under the provisions of this instrument (but not including interest

which may have been paid thereon), and of the cost of such permanent improvements as may have been made and paid for by the lessee upon the demised premises; and, if the parties are unable to agree with reference thereto, the same shall be submitted to the decision of three arbitrators, one chosen by each party, and the other by the two thus chosen, whose decision shall be final; and if at any time it shall happen that this lease shall be or become invalid, or shall be terminated without the fault of either party, then, and in such case, each party shall be restored, as nearly as may be, to the condition in which it stood before the lease, it being understood that the rent and interest paid by the lessee on the funded debt of the lessor shall be considered equivalent to the value of the occupation, but that the lessor is not to repay any part of the money agreed to be paid to it by the lessee on the first day of May, 1888, under the provisions of article 'ive hereof."

8. The net debt of the plaintiff, which the Old Colony agreed it would pay, was ascertained to be $2,170,000, which was funded by the issuance of that face amount of the plaintiff's 4 per cent. bonds maturing July 1, 1918.

9. Between April 7, 1888, and February 28, 1893, the plaintiff's railroad was operated by the Old Colony in conjunction with the latter's other lines. The Old Colony duly established, in the hands of three trustees, appointed by its directors from their own number, the sinking fund required by paragraph eleventh of the lease, and, prior to February 15, 1893, paid into said fund the principal sum of $20,000.

10. On February 15, 1893, the Old Colony leased its lines and property to the New York, New Haven & Hartford Railroad Company, a railroad corporation hereinafter referred to as the New Haven, for the term of 99 years from and after March 1, 1893, and also assigned to the New Haven the lease from the plaintiff, the New Haven becoming, and the Old Colony remaining, liable upon the covenants of plaintiff's lease.

11. The leases from the plaintiff to the Old Colony, and from the Old Colony to the New Haven, were legally made, and have been in full force and effect continuously to the present time, no default in the performance of the provisions thereof ever having occurred.

12. On July 1, 1918, the plaintiff, *at the request of its lessees,* issued its five-year 6 per cent. gold debenture bonds in the face amount of $2,170,000, the proceeds of which were used to pay its 30-year bonds maturing

on that date. The New Haven has itself conducted all financial and legal negotiation for the refunding of said funded indebtedness, including the procurement of all necessary governmental authority or approval.

13. The leasehold of the plaintiff has been consistently profitable to the New Haven from February 15, 1893, and is reasonably certain to continue to be profitable to, and essential to the integrity of, the New Haven system in the future, which facts were reasonably foreseeable on February 15, 1893.

14. On April 7, 1888, and on February 15, 1893, in the case of the Old Colony, and on February 15, 1893, in the case of the New Haven, the financial condition and credit of each company were such that it was a reasonable expectation on those dates that each company could comply fully with the provisions of plaintiff's lease and that the funded debt of the plaintiff could be paid off by said companies within the term of said lease. Either the Old Colony or the New Haven could have borrowed money on its bonds on February 15, 1893, on a basis of less than 4 per cent.

15. The value to the plaintiff of the joint and several obligation of the Old Colony and New Haven to pay the principal and interest of the plaintiff's funded debt, and of the several obligation of the New Haven, was at least $2,000,000 on February 15, 1893. The contingencies provided for in the thirteenth paragraph of the lease had no substantial effect on the value of the promise of the lessees at the time it was made.

16. Plaintiff has never made any distribution of stock, cash, or other property, on account of or with respect to the promises of the Old Colony and the New Haven to pay the principal and interest of the plaintiff's funded debt.

17. The plaintiff filed its federal income and profits tax return for the year 1918 with the then collector of internal revenue at Boston, Mass., on July 12, 1919. This return, among other things, showed the following:

| | |
|---|---|
| 1. Net income | $ 403,223 76 |
| 2. Invested capital | 4,086,956 20 |
| 3. Excess profits credit | 329,956 50 |
| 4. Excess profits tax | 21,980 18 |
| 5. Income tax | 45,509 23 |
| 6. Total tax | 67,489 41 |

18. The net income of the plaintiff was as shown on the return, to wit, $403,223.76. This was made up as follows:

| | |
|---|---|
| 1. Annual rental | $400,000 00 |
| 2. Difference between amount received from lessee for organization expenses and amount paid out therefor | 2,498 76 |
| 3. Interest on bank deposit | 725 00 |
| | $403,223 76 |

19. In computing the invested capital of $4,086,956.20 shown on the return, the amount of the plaintiff's funded debt, $2,170,000, was excluded as borrowed capital, notwithstanding no amount reflecting the obligation of the plaintiff's lessees to pay said funded debt had been included among the assets of the plaintiff.

20. For and on account of the taxes shown by the plaintiff's return to be due for the year 1918 there was paid the following sums:

| On | Amount. |
|---|---|
| 1. July 12, 1919 | $33,744 71 |
| 2. September 10, 1919 | 16,872 35 |
| 3. December 15, 1919 | 16,872 35 |
| Total | $67,489 41 |

No part of said taxes has been refunded or credited.

21. The payments of July 12, 1919, and September 10, 1919, were made to a collector of internal revenue at Boston, Mass., who was not in office as collector of internal revenue at the time this suit was commenced. The payment of December 15, 1919, was made to an acting collector of internal revenue at Boston, Mass., who was not in office in such capacity or as collector of internal revenue at the time this suit was commenced.

22. On February 29, 1924, and within the period of time provided by law, the plaintiff filed, with the then collector of internal revenue at Boston, a due and sufficient claim for refund of income and profits taxes for the year 1918 in the amount of $67,489.41. This claim for refund was rejected by the Commissioner on April 26, 1926, less than two years prior to the filing of this action.

23. Plaintiff is, and was in 1918, a common carrier by railroad, subject to the Interstate Commerce Act. The classification of accounts for railroads established by the Interstate Commerce Commission, and in effect throughout 1918, is on the accrual basis. The plaintiff kept its income and expenses for 1918 on a partly cash and partly accrual basis. Its tax returns and tax liability for 1916 and subsequent years have been audited by the Commissioner of Internal Revenue on the accrual basis, and said Commissioner has determined deficiencies against the plaintiff with respect to 1918, 1919, 1920, and 1921 on the accrual basis, as well as an overassessment for 1917 on the same basis.

24. An increase in invested capital for 1918 of at least $916,000 would automatically increase plaintiff's excess profits credit for 1918 to an amount greater than the amount of net income of plaintiff in said year; the plaintiff would be entitled to a refund of $19,342.56 internal revenue tax, and interest thereon, as prayed for. An increase in a lesser amount would entitle the plaintiff to a refund of a lesser amount.

No assignment or transfer of the plaintiff's claim herein described, or of any part thereof, or of any interest therein, has been made; no action upon said claim, other than as herein set forth, has been taken in Congress or by any of the departments of the government, or in any court, and there are no just or other offsets to or against said claim.

On the above findings of fact the plaintiff claims a right to add to its invested capital for the year 1918 a sum not less than $2,000,000. This addition would so increase its excess profits credits that an overpayment of $19,342.56 would result. It is to recover this amount that the plaintiff brings these proceedings.

The controversy involves the statutory definition of the words "invested capital" as they appear in section 326 of the Revenue Act of 1918 (40 Stat. 1057), which, so far as is now material, reads as follows:

"Sec. 326. (a) that as used in this title the term 'invested capital' for any year means (except as provided in subdivisions (b) and (c) of this section):

"(1) Actual cash bona fide paid in for stock or shares.

"(2) Actual cash value of tangible property, other than cash, bona fide paid in for stock or shares, at the time of such payment, but in no case to exceed the par value of the original stock or shares specifically issued therefor" (then follow exceptions not now material).

"(3) Paid-in or earned surplus and undivided profits; not including surplus and undivided profits earned during the year."

Subdivision (b), above referred to, reads as follows:

"(b) As used in this title, the term 'invested capital' does not include borrowed capital."

If there should be any addition to invested capital, as a result of the transactions outlined above, it is because they resulted in increasing the "earned surplus" within the meaning of the statute. This much is conceded by both the plaintiff and the defendant.

Counsel for the plaintiff, both in oral argument and in a learned and comprehensive brief, have undertaken to demonstrate that the obligations of the Old Colony and the New Haven to assume and pay indebtedness of the plaintiff constituted an asset with a value of not less than $2,000,000, which would

give to the plaintiff a "surplus," as that word is defined by the Supreme Court in Willcuts v. Milton Dairy Co., 275 U. S. 215, 48 S. Ct. 71, 72 L. Ed. 247. In that case Mr. Justice Sanford, speaking for the court, remarks that the terms "surplus and undivided profits" "as commonly employed in corporate accounting, denote an excess in the aggregate value of all the assets of the corporation over the sum of all its liabilities, including capital stock."

Plaintiff reaches its conclusion by successive steps. It is asserted that a leasehold interest may be the subject-matter of a sale for which a consideration may be paid by way of bonus, or otherwise, in addition to the rent reserved. This proposition is undoubtedly unassailable. Duffy, Coll., v. Central Railroad Co., 268 U. S. 55, 45 S. Ct. 429, 69 L. Ed. 846; Galatoire Bros. v. Lines, Coll. (C. C. A.) 23 F.(2d) 676; Appeal of J. Alland & Bro., Inc., 1 B. T. A. 631; J. Alland & Bro., Inc., v. U. S. (D. C.) 28 F. (2d) 792.

It is next asserted that the Old Colony, as lessee, acquired such a leasehold interest in the plaintiff's property and, as consideration therefor and in addition to the rent reserved, gave the sum of $3,470,000, of which $1,300,000 was paid in cash and $2,170,000 paid by assuming and agreeing to pay at some time during the term of the lease plaintiff's net indebtedness of that amount. I do not think this statement is open to objection as one of law or of fact.

It is claimed, and I have found from the undisputed testimony of witnesses, that at least since 1893, when the lease was assigned to the New York, New Haven & Hartford Railroad Company, the joint and several obligations of the Old Colony and the New Haven to pay this indebtedness of $2,170,000 had a value of at least $2,000,000, and that that valuation was not materially affected by the contingencies arising under the thirteenth paragraph of the lease quoted above.

It follows as a logical consequence that the obligations of the lessee railroads must be regarded as an intangible asset, capable of being valued, and that the valuation placed upon the obligation by the plaintiff is reasonably established.

The question presented is whether the obligations should, within the meaning of the statute, be treated as invested capital, or, more precisely stated, treated as earned surplus.

█ The consideration given for the lease obviously represented the value which the parties placed upon a term of 99 years, but any appreciation in valuation of the plaintiff's assets does not come within the meaning of the words "earned surplus" until such increase in valuation is realized by the sale of the assets.

La Belle Iron Works v. United States, 256 U. S. 377, 41 S. Ct. 528, 65 L. Ed. 998. In that case Mr. Justice Pitney observed:

"There is a logical incongruity in entering upon the books of a corporation as the capital value of property acquired for permanent employment in its business and still retained for that purpose, a sum corresponding not to its cost but to what probably might be realized by sale in the market. It is not merely that the market value has not been realized or tested by sale made, but that sale cannot be made without abandoning the very purpose for which the property is held, involving a withdrawal from business so far as that particular property is concerned."

The plaintiff and the government hold diametrically opposed views with respect to the realization of this increased valuation. The plaintiff says that it was realized when the lease was consummated, while the defendant contends that the increased valuation was not then realized, and will not be realized until the termination of the lease, or at least until the indebtedness assumed has been fully paid.

As lending support to the plaintiff's claim, it calls attention to Departmental Regulations and Decisions of the Board of Tax Appeals, to the effect that a lessor receiving a cash bonus with a rent reserved must return the bonus as taxable income for the year in which it was paid. O'Day Investment Co. v. Commissioner, 13 B. T. A. 1230 (Oct. 15, 1928); Hazlett v. Commissioner, 10 B. T. A. 332. Appeal of Nelson Land & Oil Co., 3 B. T. A. 315.

█ If the Old Colony had given to the plaintiff, as part consideration for the lease, its promissory note or its bonds in the principal sum of $2,170,000, it could not be successfully denied that the plaintiff would have then received income to that extent which would have passed into surplus. Hexter v. Commissioner, 8 B. T. A. 888. See article 34 of Regulations 45.

And this would be so, even if payable at some future date, and if, upon the happening of some possible or remote contingency, the plaintiff might have to return the note or bonds. This is the view entertained by the Board of Tax Appeals. Appeal of Boston American League Baseball Club, 3 B. T. A. 149.

It is difficult to discover any distinction in principle between a promise to pay at some future date a sum of money and a promise to provide a sinking fund to be applied to the extinguishment of debts of the promisee. The difference is one of form rather than of substance. If we look through the form to the substance of the transaction of 1888, it is apparent that one of the immediate results of the lease was a realization of a valuation which the parties had seen fit to place upon an interest in plaintiff's property, and which materially added to the "excess of its assets over its liabilities, including capital stock."

Although there is no express finding to that effect, it is a reasonable inference that at the time of the disaster of 1887 the plaintiff had a substantial earned or paid-in surplus. One of the consequences of the wreck was to increase its liabilities over $1,000,000. It solicited offers from prospective lessees, and finally negotiated a lease with the Old Colony, by the covenants of which the lessee agreed to assume all of plaintiff's net indebtedness, later funded to the amount of $2,170,000. While these bonds were in form the obligation of the plaintiff, in reality they were the obligations of the Old Colony and the New Haven. The latter had agreed to provide for the payment when due. The borrowing of $2,170,000, in order to retire the floating indebtedness of the plaintiff, was essentially the borrowing of the lessee, the plaintiff merely lending its credit for that purpose. Whether this consideration for the lease operated to augment plaintiff's assets, or reduce its liabilities, the ultimate result was the same. The plaintiff was enriched to the extent of $2,170,000, and thereby an unearned, or previously earned, increment was realized. It would seem only reasonable and proper that this realized increment should be included in plaintiff's invested capital for the purpose of determining the excess profit credits under the statute, and I so rule.

The government resists this conclusion and stresses the contingent provisions of the thirteenth paragraph as adequate grounds for holding that the value of the obligation of the lessee railroads was never realized. I have found that the contingencies did not affect the value of the obligations. The contingent events are of such a nature that, even without testimony, the finding would, in my opinion, have been a necessary inference. The two contingencies referred to in this paragraph are in effect (1) that the lease will be terminated without fault of the lessee; or (2) that it will be terminated without the fault of either party.

Undoubtedly the first contingency falls within the realm of possibilities, but in effect it means that the lease would be broken by the lessor, which would result in legal consequences not materially different from those provided for in the thirteenth paragraph of the lease. The lease has been validated by legislative enactment, and it is hardly conceivable that any legislative or administrative authority would attempt to set it aside without adequately protecting the rights of the lessor under the eleventh paragraph.

However this may be, the provisions of the thirteenth paragraph create contingencies or conditions subsequent, and in this respect the case at bar is distinguishable from Garretson v. Commissioner, 10 B. T. A. 1381, cited by the defendant. Such contingencies, therefore, are under the established practice of the department dealt with in the year in which they occur. Lewellyn v. Electric Reduction Co., 275 U. S. 243, 48 S. Ct. 63, 72 L. Ed. 262. Appeal of Manomet Cranberry Co., 1 B. T. A. 706; First State Bank of Brackettville v. Commissioner, 9 B. T. A. 975.

The law assumes that contracts of acknowledged validity will be performed in due course. Wells v. Savannah, 181 U. S. 531, 21 S. Ct. 697, 45 L. Ed. 986; Central Trust Co. v. Chicago Auditorium Asso., 240 U. S. 581, 36 S. Ct. 412, 60 L. Ed. 811, L. R. A. 1917B, 580; Reserve Natural Gas Co. of Louisiana v. Commissioner, 12 B. T. A. 219.

The lessee railroads were more than guarantors of plaintiff's indebtedness. They undertook to pay it out of their own earnings. Nor do the cases dealing with security given by lessee for the faithful performance of the covenants of the lease have application here.

In conclusion, I rule that the plaintiff is entitled to recover in this proceeding $19,342.56, with interest thereon.

Judgment may be entered accordingly.

Defendant's requests for findings of fact and conclusions of law, so far as inconsistent with the foregoing, are denied.