J. L. WASHBURN, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 27590. Promulgated June 20, 1929.

*A. McC. Washburn, Esq.*, for the petitioner.
*L. A. Luce, Esq.*, for the respondent.

**1094**

OPINION.

LITTLETON : The petitioner's first contention is that in 1922 he sustained a net loss which he is entitled to carry forward and deduct from his income for 1923. The Commissioner admits that the loss was sustained, but denies that it was sustained in the operation of a trade or business regularly carried on within the meaning of section 204 of the Revenue Act of 1921, which provides in part as follows:

(a) That as used in this section the term "net loss" means only net losses resulting from the operation of any trade or business regularly carried on by the taxpayer (including losses sustained from the sale or other disposition of real estate, machinery, and other capital assets, used in the conduct of such trade or business) ; * * *

(b) If for any taxable year beginning after December 31, 1920, it appears upon the production of evidence satisfactory to the Commissioner that any taxpayer has sustained a net loss, the amount thereof shall be deducted from the net income of the taxpayer for the succeeding taxable year ; * * *

The loss which we are here asked to recognize arose as the result of the sale of the Gales Creek & Wilson River Railroad Co. to the Northern Pacific and Great Northern Railway Companies. While the sale was made through an acquisition of stock by the purchaser, the price for such stock was fixed on the basis of a valuation of the road under the accounting system employed by the Interstate Commerce Commission. In the sale petitioner, who was the principal stockholder in the road which was sold, received $252,600.89 on account of stock which cost him $365,300, thereby sustaining a loss of $112,699.11. While not an officer or director of the railroad corporation, petitioner actively participated, both directly and indirectly, in its operation through the selection of persons for such positions, and matters of policy and general management were referred to him for decision. In so far as this transaction alone is

concerned—that is, considered without relation to petitioner's other activities—we fail to see how a " net loss " can be recognized on account thereof. This railroad corporation was not a business carried on by the petitioner, but merely a business in which he had an investment. Whatever loss may have been suffered by the corporation through the sale of its capital assets was its loss as a separate entity and this was not the same thing as the loss sustained by the petitioner on account of his investment in the stock of the corporation which carried on the business. A loss thus incurred is not a loss from a business regularly carried on by the petitioner, even though he was the principal stockholder and was active in the conduct of the corporation's business. *J. J. Harrington*, 1 B. T. A. 11; *Isadore Finkelstein*, 10 B. T. A. 585; *Margaret B. McLaughlin, Executrix*, 12 B. T. A. 19; *Horace I. Lepman et al.*, 15 B. T. A. 767.

With respect to the contention that petitioner's business was in reality his active interest and participation in a large number of corporations and business enterprises in which he was financially interested, we are unable to distinguish the situation here presented from that before us in *R. J. Palmer*, 4 B. T. A. 1028, and *Fridolin Pabst*, 6 B. T. A. 843, in which we denied the benefit of the "net loss " provisions. It is true that he gave up his law practice and entered upon a field of activities in the nature of organization, promotion, financing and development of various businesses, but we are unable to find therein the " operation of any trade or business regularly carried on " from which the loss in question resulted, in the sense that it might be termed a " net loss " as contemplated by section 204, *supra*. Apparently, the petitioner was a man of some means who, having had experience as a corporation lawyer, decided that a good return from his money, ability and experience might best be obtained by organizing corporations and businesses and investing therein. His interest in these concerns varied from active management as president to a nonactive interest as a stockholder, and, seemingly, his activity was governed largely by the direction necessary to see to it that the businesses progressed along the lines intended when organized. To express the petitioner's work in his own language: " My work was to protect my own investment and that of my friends." But in such work we are unable to perceive the operation of a business. Each of these several concerns carried on a business in which the petitioner had an investment, but the fact that he had such an investment and interest in several enterprises instead of one makes a difference of degree only, in so far as the business operation was concerned. Like any investor—whether majority or minority, he was interested in seeing the businesses pay a return on his investment, and in the case of the corporation whose stock was sold,

which resulted in the loss in question, and where the petitioner was the organizer and principal stockholder, it was not unnatural that he should be actively interested in seeing that everything possible was done to make the concern a success, not only on account of his own investment, but also on account of the other stockholders whom he may have induced to invest in the business. Apparently, he was active only to the extent which he considered was for the best interests of the respective businesses and gave him the best return on the funds which he had invested. The fact that the concerns were under no legal contracts to pay him a salary, does not, in our opinion, change the situation; it is often true that a majority stockholder does not elect to have paid to himself full compensation for his services, for the reason that he is satisfied to receive his return in the form of greater dividends.

In view of the foregoing considerations and the other facts of record in the case, we are not satisfied that the petitioner was engaged in carrying on a trade or business. Admittedly, he was not engaged in buying and selling securities, and the businesses carried on by those several concerns were their own operations, not those of the petitioner. Evidently, when Congress enacted this provision which permits losses of one year to be taken as a deduction in a year or years when the loss did not occur, it did not contemplate that all losses should be so treated, but only those losses which would arise through the operation of a trade or business regularly carried on. We are not satisfied that petitioner's activities comply with such a definition and the action of the Commissioner in denying to him the benefit of the " net loss " is accordingly sustained.

Petitioner's second contention is that an amount received in 1923 from the Alworth-Washburn Co. and reported on his income-tax return as a dividend was in fact a distribution of capital.

The Alworth-Washburn Co. is a timber-holding corporation. From the date of incorporation in 1906 or 1907 its books were kept on a basis of capitalizing the carrying charges on timber property. In 1923 a sale was made of approximately two-thirds of its holdings and the proceeds were distributed to the stockholders. Petitioner received $15,970.50 upon such distribution and determined that of this amount $6,683.50 represented a dividend within the meaning of section 201(a) of the Revenue Act of 1921, which amount was so reported on his income-tax return. The respondent readjusted the amount to $6,581.44. On audit of the Alworth-Washburn Co.'s income-tax return, the respondent disallowed the method of accounting which capitalized carrying charges, and determined that such amounts should have been charged to expense for the years in which incurred. If changed to this basis of accounting, the books would

show a deficit in the surplus account at January 1, 1923, in the amount of $95,698.13. Profit from the sale of the timber property in 1923 amounted to $67,392.71, which leaves a deficit of $28,305.42 at the date of the distribution. It is the petitioner's contention that on the accounting basis prescribed by the respondent no surplus existed from which dividends could have been declared and that the distribution was from capital.

Section 201 of the Revenue Act of 1921 provides in part as follows:

(a) That the term "dividend" when used in this title * * * means any distribution made by a corporation to its shareholders or members, whether in cash or in other property, out of its earnings or profits accumulated since February 28, 1913, * * *

(b) For the purposes of this Act every distribution is made out of earnings or profits, and from the most recently accumulated earnings or profits, to the extent of such earnings or profits accumulated since February 28, 1913; but any earnings or profits accumulated or increase in value of property accrued prior to March 1, 1913, may be distributed exempt from the tax, after the earnings and profits accumulated since February 28, 1913, have been distributed. * * *

(c) Any distribution (whether in cash or other property) made by a corporation to its shareholders or members otherwise than out of (1) earnings or profits accumulated since February 28, 1913, or (2) earnings or profits accumulated or increase in value of property accrued prior to March 1, 1913, shall be applied against and reduce the basis provided in section 202 for the purpose of ascertaining the gain derived or the loss sustained from the sale or other disposition of the stock or shares by the distributee.

The position taken by the respondent that the carrying charges on timber land should not be capitalized has been repeatedly approved by the courts and Board. *Arthur C. Fraser*, 6 B. T. A. 346; affd. (C. C. A.) 25 Fed. (2d) 653; *Westerfield* v. *Rafferty*, 4 Fed. (2d) 590; *Columbia Theatre Co.*, 3 B. T. A. 622; *Pacific Coast Redwood Co.*, 5 B. T. A. 423; *Ottawa Park Realty Co.*, 5 B. T. A. 474; and *Spring Valley Water Co.*, 5 B. T. A. 660. The accounting basis having been changed by the respondent for the purpose of computing net income, consistency requires that the same basis be applied to other transactions during the taxable year. We are convinced by the evidence that upon the revised basis of accounting the Alworth-Washburn Co. had a deficit in the surplus account at the date of the distribution to stockholders.

The provisions of the Revenue Act of 1921 with regard to taxation of "dividends" differ from those of preceding and subsequent Acts in the matter of liquidation distributions. In the 1918 and 1924 Acts dividends paid in liquidation were to be regarded as payments in exchange for stock. Under these Acts the nature of the distribution was left open. The 1921 Act provides that distributions other than from accumulated earnings or profits or increase in value of

property shall be applied to reduce the basis of the stock. For a review of the various provisions relating to the taxation of dividends, see *Frank D. Darrow*, 8 B. T. A. 276.

We have held, in *Crystal Ice Co.*, 14 B. T. A. 682, that where a corporation sustains a deficit due to losses of operation, and thereafter pays dividends before such deficit is made whole and the original capital restored, such dividends represent a return to stockholders of a part of the capital of the corporation, and in computing invested capital the paid-in capital is to be reduced by the amount of the deficit caused by the payment of such dividends.

In *Willcuts* v. *Milton Dairy Co.*, 275 U. S. 215, the Supreme Court held that the term "undivided profits" used in the Revenue Act of 1918 was there employed in its ordinary meaning of an excess in the aggregate value of the assets of a corporation over the sum of its liabilities, including capital stock, so that the profits earned by a corporation which were insufficient to offset an impairment of its paid-in capital were not "undivided profits" to be included as "invested capital" in computing the excess-profits-tax credits allowable.

Section 201(a), above, defines the term "dividend" as a distribution out of earnings or profits accumulated since February 28, 1913. If the income for the year 1923 is to be applied to replace impaired capital before any amount is available for the declaration of dividends, then there were no "accumulated earnings or profits or increase in value of property." We understand this to be the meaning of "accumulated earnings or profits." It follows that the distribution was out of capital and under the provisions of section 201(c) of the Revenue Act of 1921 should be applied against and reduce the basis of the stock in respect of which the distribution was made.

A decision to the contrary is *Blair* v. *United States*, 63 Ct. Cls. 193 (certiorari denied, 275 U. S. 546), where it is held that, where there were earnings or profits available in the taxable year 1918 sufficient at the time to pay a dividend declared and distributed by a corporation in said year, the distribution was income for that year in the hands of the stockholders, notwithstanding the corporation has had a loss in excess of its gains for the period of its corporate existence as well as for the period from March 1, 1913, to the end of the said taxable year. The interpretation there placed upon *Edwards* v. *Douglas*, 269 U. S. 204, cited by the Court of Claims in support of its decision, can not be sustained in the light of the Supreme Court's decision in *Willcuts* v. *Milton Dairy Co.*, *supra*.

Reviewed by the Board.

*Decision will be entered under Rule 50.*

ARUNDELL dissents on the first point.