## WILLCUTS, COLLECTOR, *v.* MILTON DAIRY COMPANY

CERTIORARI TO THE CIRCUIT COURT OF APPEALS FOR THE EIGHTH CIRCUIT.

No. 156. Argued October 6, 7, 1927.—Decided November 21, 1927.

Under Revenue Act, 1918, Title III, providing that the "excess-profits" credit of a domestic corporation should "consist of a specific exemption of $3,000 plus an amount equal to 8 per centum of the invested capital for the taxable year," (§ 312) and defining "invested capital," with certain exceptions, as the actual cash and cash value of other property bona fide paid in for stock or shares, at the time of such payment and "(3) Paid-in or earned surplus and undivided profits; not including surplus and undivided profits earned during the year." *Held,* that the term "undivided profits" is employed in its ordinary meaning of an excess in the aggregate value of the assets of a corporation over the sum of its liabilities, including capital stock, so that profits earned by a corporation which were insufficient to offset an impairment of its paid-in capital, were not "undivided profits," to be included as "invested capital" in computing the excess-profits credits allowed by the Act. P. 218.

·8 F. (2d) 178 (D. C.), affirmed.

15 F. (2d) 814 (C. C. A.), reversed. ·

CERTIORARI, 273 U. S. 687, to a judgment of the Circuit Court of Appeals which reversed a judgment of the District Court in favor of the Collector in a suit brought by the Dairy Company to recover excess-profits taxes.

*Solicitor General Mitchell,* with whom *Assistant Attorney General Willebrandt,* and *Messrs A. W. Gregg,* General Counsel, and *J. R. Wheeler,* Special Attorney, Bureau of Internal Revenue, were on the brief, for petitioner.

*Messrs. Haydn S. Cole* and *Ira C. Oehler* for respondent.

MR. JUSTICE SANFORD delivered the opinion of the Court.

The Dairy Company, a Minnesota corporation, brought this suit against the Collector to recover additional excess-profits taxes assessed against it under Title III of the Revenue Act of 1918[1] for its taxable years 1919 and 1920,[2] and paid under protest. Judgment for the Collector in the District Court, 8 F. (2d) 178, was reversed by the Circuit Court of Appeals. 15 F. (2d) 814.

The question here is, whether profits earned by the Company that were insufficient to offset an impairment of its paid-in capital, were "undivided profits" to be included as "invested capital" in computing the excess-profits credits allowed by the Act.

Section 312 of the Act provided that the "excess-profits credit" of a domestic corporation should "consist of a specific exemption of $3,000 plus an amount equal to 8 per centum of the invested capital for the taxable year." Section 326 (a) defined the term "invested capital," with certain exceptions not now material, as the actual cash

[1] 40 Stat. 1057, 1088, c. 18.

[2] These were the fiscal years of the Company ending on the last day of February in 1919 and 1920, respectively. They are designated, in accordance with §§ 200 and 300 of the Act, by the years in which they ended.

and cash value of other property, bona fide paid in for stock or shares, at the time of such payment, and "(3) Paid-in or earned surplus and undivided profits; not including surplus and undivided profits earned during the year." Art. 838 of Treasury Regulations 45 [3] declared that: "Only true earned surplus and undivided profits can be included in the computation of invested capital, . . . In the computation . . . full recognition must first be given to all expenses incurred and losses sustained from the original organization of the corporation down to the taxable year. . . . There can, of course, be no earned surplus or undivided profits until any deficit or impairment or paid-in capital due to depletion, depreciation, expense, losses, or any other cause has been made good."

The Company was organized with a paid-in capital of $145,817.04. At the end of 1917 [4] an operating deficit of $70,296.12, shown on the books, impaired the capital to that extent. In 1918, the Company had a net income of $11,489.26; and in 1919, a net income of $22,908.14. These earned profits were not distributed, and $29,853.03 thereof remained in the business at the end of 1919, without having been applied to reduce the impairment of the capital.

In the returns on which the excess-profits taxes were originally assessed and paid, the Company, treating these earnings as "undivided profits" constituting part of its "invested capital," reported as invested capital for 1919 the sum of the paid-in capital, $145,817.04, and the profits, $11,489.26, earned in 1918; and as invested capital for 1920, the sum of the paid-in capital and the $29,853.03 of profits earned in 1918 and 1919 and remaining in the business.

---

[3] Regulations 45 (1920 Ed.), p. 204.

[4] The references in this opinion are to the taxable years, designated as stated in note 2, *supra*.

Thereafter, on an audit of the returns, the Commissioner of Internal Revenue, while allowing for each year as " invested capital " the amount of paid-in capital, excluded from the computation of the " invested capital " the amounts claimed as " undivided profits," on the ground that they did not constitute true " undivided profits," but should be applied to reduce the impairment of the capital. And on the basis of such exclusions he assessed the additional taxes.

We think that clause (3) relating to " surplus and undivided profits " was correctly interpreted by Art. 838 of the Treasury Regulations. Both these terms, as commonly employed in corporate accounting, denote an excess in the aggregate value of all the assets of a corporation over the sum of all its liabilities, including capital stock. See *Edwards* v. *Douglas,* 269 U. S. 204, 214; *Insurance Co. of North America* v. *McCoach* (D. C.), 218 Fed. 905, 908. Aside from the fact that a surplus may not only be " earned," as where it is derived from undistributed profits, but " paid-in," as where the stock is issued at a price above par, the distinction between these terms, as commonly employed, is that the term " surplus " describes such part of the excess in the value of the corporate assets as is treated by the corporation as part of its permanent capital, usually carried on the books in a separate " surplus account "; while the term " undivided profits " designates such part of the excess as consists of profits " which have neither been distributed as dividends nor carried to surplus account." *Edwards* v. *Douglas, supra,* 214. But it is a prerequisite to the existence of " undivided profits " as well as a " surplus," that the net assets of the corporation exceed the capital stock. Hence, where the capital is impaired, profits, though earned and remaining in the business, if insufficient to offset this impairment do not constitute " undivided profits."

We cannot doubt that this term was used in clause (3) with its ordinary meaning, nor agree with the view of the Circuit Court of Appeals that the arbitrary definition given by the Act to the term " invested capital " not equivalent to that of the ordinary invested capital of commerce, indicates that the words " surplus and undivided profits " were not used with their ordinary meaning as conditioned by an excess of assets. We do not think Congress intended that a corporation whose capital was impaired should be entitled to treat profits that, though earned, were insufficient to make good the impairment and create a surplus, as " undivided profits." This would not only give the term " undivided profits " a meaning entirely at variance with ordinary usage—making it merely equivalent to any earned profits remaining in the business—but would grant the privilege of twice disregarding the impairment of capital, that is, once in computing the paid-in capital, which under the express terms of the Act was to be taken at the full cash or money value at the time of payment, and again in computing the " undivided profits." This term is entirely inapt to express such a purpose.

This conclusion is in harmony with the general view expressed in *LaBelle Iron Works* v. *United States,* 256 U. S. 377, 388. Dealing there in another aspect with the Revenue Act of 1917, which contained a similar clause concerning the inclusion of " paid-in or earned surplus and undivided profits " as " invested capital " in determining the amount of the excess-profits tax, this Court said, *arguendo,* that in order to avoid exaggerated valuation of invested capital " the act resorted to the test of including nothing but money, or money's worth, actually contributed or converted in exchange for shares of the capital stock, or actually acquired through the business activities of the corporation . . . and coming in *ab extra,* by

way of increase over the original capital stock," and that the provision including "paid in or earned surplus and undivided profits used or employed in the business" recognized "that in some cases contributions are received from stockholders in money or its equivalent for the specific purpose of creating an actual excess capital over and above the par value of the stock." And see *Appeal of Valdosta Grocery Co.,* 2 B. T. A. 727, 729, and *Appeal of Gould Copper Co.,* 5 B. T. A. 499, 517.

The fact that under Title II of the Revenue Act of 1918 providing for an income tax, a corporation, as was held in *Long Beach Improvement Co.* v. *Commissioner of Internal Revenue,* 5 B. T. A. 590, was subject to a tax upon its net income despite an impairment of its capital, is not of moment. The deductions from gross income allowed by that Title do. not refer to invested capital, surplus or undivided profits, and its provisions throw no light upon the meaning of those terms as used in Title III providing for an excess-profits tax.

The judgment of the District Court is affirmed; and that of the Circuit Court of Appeals

*Reversed.*