## APPEAL OF GRAND RAPIDS DRY GOODS CO.

Docket No. 3642.   Promulgated June 19, 1928.

*Frank E. Seidman, C. P. A.*, for the petitioner.
*Arthur J. Seaton, Esq.*, for the respondent.

OPINION.

GREEN: When the Grand Rapids Dry Goods Co., on August 1, 1919, purchased the stock of the Corl-Knot Realty Co., these two corporations became affiliated within the meaning of section 240 of the Revenue Act of 1918. Under the provisions of subdivision (a) of that section, corporations are required to make a consolidated return of net income and invested capital. Section 326 of the same Act

prescribes the items which may be included in invested capital. The material parts of that section are as follows:

(a) That as used in this title the term "invested capital" for any year means (except as provided in subdivisions (b) and (c) of this section):

(1) Actual cash bona fide paid in for stock or shares;

(2) Actual cash value of tangible property, other than cash, bona fide paid in for stock or shares, at the time of such payment, but in no case to exceed the par value of the original stock or shares specifically issued therefor, unless the actual cash value of such tangible property at the time paid in is shown to the satisfaction of the Commissioner to have been clearly and substantially in excess of such par value, in which case such excess shall be treated as paid-in surplus: * * *.

There is no dispute between the parties as to the facts. The issue presented by the pleadings is purely one of law. The respondent in computing the consolidated invested capital allowed the purchase price of the stock, $15,000. The petitioner says that it is entitled to $60,000 by reason of the purchase. In other words, the parties appear to be in accord as to the method of computing and the amount of the consolidated invested capital save and except the amount to be added thereto by reason of the acquisition for $15,000 in cash of the stock of the subsidiary whose separate invested capital the respondent concedes would be $60,000. In this respect the situation is comparable to one in which the parties are agreed upon the cost of the building and present to us only the question of the life of the building so that they may apply the proper rate of depreciation to the agreed cost. This practice of narrowing the issues to the real controversies materially reduces the work of the Board.

In *Middlesex Ice Co.* v. *Commissioner,* 9 B. T. A. 156, we had a question involving the determination of the consolidated invested capital where the Middlesex acquired 99 per cent of the capital stock of another corporation. In the course of the opinion we said:

Each member of the affiliated group enters the consolidation with its invested capital as defined by section 326 of the Revenue Acts of 1918 and 1921. From this preliminary exhibit there is then eliminated such items or amounts as are shown to be duplications either of investment or of earned surplus and undivided profits.

Since the Corl-Knot Co. paid no dividends prior to December 31, 1919, its operating deficit would in no way impair its paid in capital in computing the statutory invested capital for 1919. *Appeal of Kenny Brothers Co.,* 1 B. T. A. 1019. Cf. *Willcuts* v. *Milton Dairy Co.,* 275 U. S. 215.

It is the contention of the petitioner, first, that the provisions of section 240, quoted above, do not justify the disregard of corporate entities in determining the invested capital of affiliated corporations, and, second, that under section 326 (a) (1) "actual cash bona fide paid in for stock or shares," is unqualifiedly made a part of invested

capital and no subsequent reduction of this amount is contemplated by the Act.

The first of these contentions was very definitely disposed of in the *Appeal of Farmers Deposit National Bank and Affiliated Banks,* 5 B. T. A. 520, wherein we said:

* * * On the other hand, it said, plainly enough we think, in section 240(a) of the Revenue Act of 1918, that the generally recognized principle of corporate identity was to be overridden for the purpose of the income and profits taxes; that the separate existences of the affiliated companies ceased for tax purposes. It created out of two or more affiliated companies, otherwise having separate identities, a new tax status; and when it did so Congress intended that the group should have the attributes of a single taxpayer. And where, in other sections of the statute, Congress speaks of corporations as individual taxpayers, it means as to the sections dealing with consolidated units to treat the consolidated unit as a single corporation.

See also *Appeal of American La Dentelle, Inc.,* 1 B. T. A. 575; *Appeal of Frank G. Shattuck Co.,* 2 B. T. A. 7; *Appeal of Gould Coupler Co.,* 5 B. T. A. 499; and *Appeal of H. S. Crocker Co.,* 5 B. T. A. 537.

Since under the law two or more affiliated corporations are to be treated for tax purposes as a single corporation, the second contention of the taxpayer is sound only as it is applicable in the case of a single corporation. In *Appeal of H. S. Crocker Co., supra,* we said:

* * * Under the affiliation provisions of the statute, the acquisition by one company of the stock of another, thereby creating affiliation, creates no additional investment in the affiliated group. By the act which creates the affiliation the group acquires a part of its own capital stock.

In the *Appeal of Farmers Deposit National Bank, supra,* we find the further statement:

When the Farmers Deposit Trust Co. purchased the shares of capital stock of the Farmers Deposit National Bank, which we have under consideration, assuming that they were purchased from others than members of the affiliated group, the transaction constituted in substance a partial retirement of the outstanding capital stock of the consolidation, a repurchase by a corporate taxpayer of its own capital stock, a withdrawal of a part of the capital of the consolidated group, and a return to the stockholders of their investment in the consolidation. The effect of the purchase of this stock upon the consolidated invested capital was the same as though the transaction was that of a single corporation repurchasing its own capital stock.

The situation in the instant case is somewhat analogous to a purchase by a corporation of its own stock. This question has been before the Board in a number of cases and is no longer an open matter. *Appeal of Steinbach Co.,* 3 B. T. A. 348; *Appeal of Hutchins Lumber & Storage Co.,* 4 B. T. A. 705; and *Appeal of Clearfield Lumber Co.,* 3 B. T. A. 1282, which treats of this question as follows:

It must be clear that the provisions of section 326 are not to be read literally in the sense that invested capital at all times includes all property values

theretofore paid in to a corporation for stock without regard to the later history of that stock. Such a construction would defeat the manifest purpose of the provision, for capital which has been contributed and then withdrawn certainly may not after its withdrawal be said to be "invested." In *LaBelle Iron Works* v. *United States*, 256 U. S. 377, the court, defining invested capital, says (p. 388) :

"The word 'invested' in itself imports a restrictive qualification. When speaking of the capital of a business corporation or partnership, such as the act deals with, 'to invest' imports a laying out of money, or money's worth, either by an individual in acquiring an interest in the concern with a view to obtaining income or profit from the conduct of its business, or by the concern itself in acquiring something of permanent use in the business; in either case involving a conversion of wealth from one form into another suitable for employment in the making of the hoped-for gains."

Where capital has been withdrawn from the corporation, it certainly is no longer a possible source of future gains in that venture. From the standpoint of the stockholder, the capital is no longer at the risk of the enterprise, but has been reconverted to his undisputed control and use. *Appeal of Minneapolis Sash & Door Co.*, 2 B. T. A. 505.

After considering the opinions cited above, we are of the opinion that cash paid in for stock retains its character as such only so long as it is invested in the business, but when the amount so paid in or any part thereof is withdrawn from the business and returned to the stockholders for stock, it can be no longer classified as "cash bona fide paid in for stock" within the meaning of section 326. Accordingly, the cash paid into the Corl-Knot Realty Co. for stock should be reduced by $15,000, the amount returned to the stockholders, in computing the invested capital of the affiliated group. Since the subsidiary had an operating deficit, the amount thereof must be applied in the reduction of the earned surplus, if any, of the parent company.

Reviewed by the Board.

> *Judgment will be entered after 15 days' notice, under Rule 50.*

STERNHAGEN, dissenting: The facts in the record are in my opinion too uncertain to justify the decision. The answer admits "that the original paid-in capital of the Corl-Knot Realty Co. was $60,000" and that the petitioner acquired the outstanding capital stock for $15,000 cash. How this so-called "paid-in capital" fits into section 326 of the Revenue Act of 1918 does not appear. It may have been cash or tangible property paid in for stock or shares. But if it was intangible property, the statutory invested capital would be reduced by the statutory limitation, and if it was services there would be no invested capital whatever. It seems to me that these questions must be answered by evidence before the consolidated invested capital can be determined. At best, consolidated invested capital presents a difficult problem and in my opinion the respondent's determination in this case should not be reversed without knowing the facts.

I agree that respondent was theoretically wrong in treating the situation as though the petitioner for $15,000 had bought the assets of the Corl-Knot Co., when in fact it had bought the stock.

MARQUETTE agrees with this dissent.

TRAMMELL, dissenting: I am unable to follow the reasoning upon which this opinion is based. The result of the decision is that the greater the value of the assets or the greater amount paid for the stock, the less the invested capital represented thereby. This seems to me to be wholly incorrect. On this theory, if the stock had been practically worthless and only $100 had been paid for it, then the difference between that amount and $60,000 would be included in consolidated invested capital, but if the business had prospered and the stock had sold for par or in excess thereof, then no amount whatever could be included in the consolidated invested capital with respect to the acquisition of this stock. I think that the mere statement of this result shows the fallacy of the theory upon which the decision is based.

It seems to me to be erroneous to say that when the corporation purchased stock in another corporation with which it was not at that time affiliated, any stock was being retired or any cash was withdrawn by the stockholders from the corporation. There was no affiliated group of corporations when this transaction occurred. The affiliation did not occur until after the purchase of the stock.

The stockholders in the corporation which became the subsidiary after the transaction sold their stock to the present corporation. The parent corporation then simply took the place of the former stockholders. A mere change of stockholdings by purchase and sale does not, in my opinion, amount to a retirement of stock. The actual fact is that the capital stock was not reduced. It remained what it was. I do not believe the separate entities should be so disregarded. Even if the corporation had been affiliated at the time of the transaction and the parent company had bought some minority stock, I can see no sound basis for holding that the stock acquired was retired.

The taxpayer and the Commissioner have presented two bases for the determination of the invested capital. The taxpayer determined the invested capital of the two companies separately and added the two together, while the Commissioner substituted the purchase price of the stock as representing the investment in assets. It seems to me that neither theory is correct. The funds with which the parent company bought the stock of the subsidiary were already included in invested capital of the parent unless they were earnings of the year. This fact we do not know, however. If the stock was not purchased with current earnings there would be a duplication which should not, in any event, increase invested capital.

We are not now concerned with a determination of earned surplus as affected by the deficit.

———

Murdock, dissenting: The prevailing opinion, in my judgment, depends upon an incorrect principle and reaches an incorrect result. The Corl-Knot Realty Co. was entitled to $60,000 of invested capital because cash or property having a total value of $60,000 was paid in for stock or shares. Its invested capital thus created was not changed by the fact that the original stockholders sold their stock to a new stockholder or to new stockholders. This is so whether the stock was sold for more or less than $60,000. When the Grand Rapids Dry Goods Co. purchased the stock the fact that $60,000 had been paid in for stock was not changed. It is immaterial that it was not paid by the then owner of the stock.

The question is not as narrow as the prevailing opinion would have it. In order to compute the consolidated invested capital of the two corporations, it is necessary to know many facts concerning the invested capital of each. We do not know enough about the invested capital of these two corporations to say that the Commissioner was in error. Consistent with the facts that we do know, it is altogether possible that he has allowed either too much or too little consolidated invested capital.

The Corl-Knot Realty Co. had an operating deficit of an undisclosed amount. Suppose, for example, this deficit had amounted to $45,000 and that the assets of the company were worth only $15,000. This company then would bring into the consolidation $60,000 of invested capital and an operating deficit of $45,000. This operating deficit would serve to offset a like amount of the other company's surplus, if the other company has such surplus. The net result would be a possible balance of $15,000, which the Corl-Knot Realty Co. might have brought into the consolidated invested capital. However, the Grand Rapids Dry Goods Co. parted with $15,000 in cash when it acquired the stock of this second company. So that in the consolidated balance sheet there would be a duplication of $15,000 on account of this transaction, thus requiring the elimination of $15,000 from consolidated invested capital. It is therefore quite possible that consolidated invested capital would not be any greater than the invested capital of the parent company.

Tested in the light of the opinion in *LaBelle Iron Works* v. *United States*, 256 U. S. 377, this result seems perfectly proper, inasmuch as the stockholders of the Grand Rapids Dry Goods Co. were, after consolidation, the only investors and they had not risked or invested one cent more after the consolidation than before consolidation. If they

702

as individuals had bought the stock of the Corl-Knot Realty Co. the situation would have been quite different.

The facts assumed above are not inconsistent with the facts already in evidence and under those assumed facts the petitioner would not be entitled to as great an amount of invested capital as the Commissioner has already allowed him. Even if I were wrong about the elimination of the $15,000 in the above example, nevertheless the Commissioner would not be in error.