CRYSTAL ICE CO., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 13134. Promulgated December 12, 1923.

*B. S. Womble, Esq.*, and *Lee I. Park, Esq.*, for the petitioner.
*A. H. Murray, Esq.*, for the respondent.

684

OPINION.

PHILLIPS: Several of the issues framed by the pleadings have been disposed of by stipulation of the parties to the following effect:

I. The taxpayer is entitled to additional deductions from income as follows:

|  | 1920 | 1921 |
|---|---|---|
| Additional depreciation | $2,496.66 | $3,563.84 |
| Inventory adjustments | 3,541.29 | 1,663.92 |
| Ice tong expense | | 110.00 |
| | 6,037.95 | 5,337.76 |

The answer admits that invested capital for 1921 was erroneously reduced by $6,251.75 on account of taxes of a prior year, thus disposing of another issue.

One of the errors alleged was waived, leaving for our consideration only the following alleged errors:

(1) The reduction of invested capital for 1920 by $95,675 and for 1921 by $86,555.36, for alleged capital deficit;

(2) The reduction of invested capital for 1920 by $12,775 and for 1921 by $1,793.97 on account of dividends paid in such years;

(3) Failure to compute the profits tax under section 328 of the Revenue Acts.

The issues with respect to invested capital are so broad that it becomes necessary to review the petitioner's financial history and build up its invested capital step by step.

In 1912 petitioner issued 747 shares of its capital stock to one Payne for the properties of the Fries Manufacturing & Power Co. Under the provisions of section 326 of the Revenue Acts of 1918 and 1921 the property so acquired is to be included in invested capital at its actual cash value at the time of acquisition. The petitioner contends that such property had a value of at least $114,700 against which is to be set off notes of $40,000 issued in part payment for the property, making the actual value of the property received for the stock equal to the par value of the stock issued therefor, viz, $74,700.

The agreement for the transfer of these assets to petitioner took place one month after Payne had arranged to acquire them from the Fries Company for $10,000 cash and $40,000 in notes. Apparently no transfer was made to Payne by the Fries Company, for it appears that petitioner issued its notes for $40,000 directly to the Fries Company. Furthermore, it appears that the property was encumbered by a mortgage which covered other property of the Fries Company and that it was necessary to secure a release from the trustee under such mortgage. The offer contemplated that the property would be conveyed to the petitioner by the Fries Company. From all the circumstances we conclude that at the time Payne made his offer, he had not yet taken over the business of the Fries Company.

To sustain its contention that the property of the Fries Company had a value of at least $114,700 when acquired by it, petitioner offered the testimony of five witnesses, none of whom were especially well qualified to testify to the actual cash value of such property. Their testimony appears to be based principally upon general knowledge of reproduction cost of a plant of similar capacity and the price paid by petitioner later in 1912 for the plant and business of a competitor.

We have had occasion in the past to point out that reproduction cost is not necessarily related to fair market value. The plant of the Fries Company had a daily capacity of 65 tons of ice. Whether the machinery was old or modern, efficient or inefficient as compared with the latest improvements, or whether the plant was

laid out for most economical operation does not appear. Nor does it appear that the witnesses considered these factors. The opinions appear to be based in part upon their estimate that it would cost certain sums in 1912 to construct a plant of similar capacity. It does not seem that this is sufficient to overcome the very positive evidence of fair market value which is offered by an actual sale of this same property within the month.

The Fries Company used its plant for the manufacture of ice. It sold its entire output to one Thomas who had built up a retail trade throughout the city. The witnesses who testified as to value appeared to consider that petitioner had acquired from Payne the organization and business of Thomas. This appears to be an unjustifiable conclusion. The sale by the Fries Company left Thomas without any source of supply of ice within the city, since the only other plant was owned by the Carolina Cold Storage & Ice Co. which retailed its product. The petitioner, desiring to retail its ice, took over most of the men whom Thomas employed, and perhaps his delivery equipment, but there is nothing to indicate that this had been done by Payne before he agreed to convey the property of the Fries Company to the petitioner. There is nothing that would indicate that Payne ever attempted to establish delivery routes. It was the petitioner who took the chance that it might, on the one hand, fall heir to the routes there.ofore operated by Thomas or might, on the other hand, have to fight Thomas as a competitor, should it go into the retail business. The stock of petitioner was issued for the assets of the Fries Company and it is the value of these assets which we must consider, not the value of these assets coupled with the retail routes operated by Thomas.

It appears that later in 1912 petitioner acquired the plant and business of the Carolina Cold Storage & Ice Co., its only competitor, paying $85,000 therefor. This plant had a capacity of 50 tons daily and was operated in leased premises. It retailed its ice and the petitioner acquired its retail business as well as its manufacturing plant and thereby eliminated its only competitor. It is testified that the retailing of ice was more profitable than the manufacture. We are of the opinion that the market value paid for the manufacturing business and plant of the Fries Company can not properly be ascertained upon the basis of the price paid for this second plant and its delivery routes.

The opportunities of the witnesses to learn the market values of ice plants had been extremely limited. As we said above, their opinions were based partly on reproduction cost, partly on the assumption that petitioner acquired from Payne the retail route of Thomas, and partly upon the price paid in the purchase of the second

business. None of these form a proper basis for determining the fair market value of the assets acquired from the Fries Company, although they may all be considered if given their proper weight. This we are satisfied has not been done. As between an actual transaction and this opinion testimony, we accept the value fixed by the sale to Payne. We are of the opinion that petitioner is entitled to include in its invested capital $10,000 on account of the assets paid in for $74,700 of its common stock.

Between 1912 and 1918, inclusive, petitioner issued $120,300 par value of its capital stock for cash or assets having that value. In computing its invested capital we therefore start with a paid-in capital of $130,300. This is to be increased by any earned surplus and decreased by any part of the paid-in capital which has been returned to the stockholders. On December 31, 1914, the petitioner had an earned surplus of $23,171.83. In 1915 the petitioner sustained a loss of $81,592.56 in the liquidation of a subsidiary, whose property had been destroyed by a fire in the previous year. The evidence shows that during that year it opened a new set of books which were based upon an appraisal of its assets and which reduced the values at which assets were carried. These would appear to be, in part at least, the same assets which we have determined may be included in invested capital at only $10,000, but which petitioner had carried at a net value of $74,700. We are not concerned with any adjustments in capital based on a revaluation, (*LaBelle Iron Works* v. *United States*, 256 U. S. 377) and consequently we ignore the accounting entries which were made. It would appear that at this point, leaving out of consideration any earnings or dividends for 1915, the capital originally paid in had been impaired to the extent of $58,420.73. This impairment was not caused by the return to stockholders of any part of the capital paid in, but was due to losses sustained in the business.

From January 1, 1915, to December 31, 1919, the earnings of the petitioner were $65,507.71. During this same period it had declared dividends of $30,975, all of which had been paid on or before January 1, 1920.

We thus find, at the beginning of 1920, a corporation whose paid-in capital, for invested capital purposes, was $130,300. In 1915 this capital had been impaired by operating losses to the extent of $58,420.73. Between 1915 and the beginning of the first taxable years it had earnings of $65,507.71. Had these earnings been retained, the losses would have been repaired. Instead, dividends were paid (including those paid on January 1, 1920) to the extent of $30,975, which left the original paid-in capital impaired by the amount of $23,888.02. The question then arises, Is this a deficit due to losses

of operations, in which case the amount of the paid-in capital may be allowed as invested capital ($130,300), or is it caused by the repayment to the stockholders of a part of the capital paid in, in which case the paid-in capital is to be reduced by the amount returned to stockholders? While the situation is not the same as that presented in *Willcuts* v. *Milton Dairy Co.*, 275 U. S. 215, the principles involved are the same. So long as the capital was impaired by losses, there would be no profits out of which dividends could be paid. Any payment was necessarily an impairment of the original paid-in capital. It follows that the invested capital at the beginning of the year must be measured by the original paid-in capital reduced by the amount of the deficit. See *Troy Record Company*, 11 B. T. A. 298.

On December 1, 1920, the petitioner declared a dividend of $6,650, which was not paid until January 31, 1921. Inasmuch as the earnings of 1920 to the date of declaration were more than sufficient to pay the dividend declared in that year, such dividend did not operate to impair the original invested capital below the point at which it stood impaired at the beginning of the year. *Paauhau Sugar Plantation Co.*, 13 B. T. A. 500.

At January 1, 1921, the petitioner had made good its deficit and had an earned surplus of $7,303.27, after deducting the dividend declared on December 1, 1920. On April 15, 1921, petitioner declared a dividend of $9,650, which was paid on September 30, 1921. The Commissioner has determined the income of the petitioner for 1921 to be $56,882.02 which, if prorated over the year, would establish that the current earnings to the date of declaration of the dividend were in excess of such dividend. The petitioner is therefore entitled to compute its invested capital for 1921 upon the basis of an earned surplus of $7,303.27 existing at the beginning of the year and which continued unimpaired throughout the year.

The petitioner claims that it is entitled to have its tax computed under section 328 of the Revenue Acts of 1918 and 1921. Pursuant to Rule 62 of the Board, the hearing was confined to the issues defined in subdivisions (a) and (b) of that rule, viz, the issues other than those which arise under section 328 and the question whether petitioner has established its right to have its tax computed under section 328. The petitioner does not fall within subdivisions (a), (b) or (c) of section 327 of the revenue acts and we see no abnormal conditions affecting its capital or income which would bring this petitioner within subdivision (d) of that section. Its claim for assessment under section 328 is denied.

*Decision will be entered under Rule 50.*