## UNITED STATES v. BOSTON & PROVIDENCE R. R. CORPORATION.

Circuit Court of Appeals, First Circuit.
Jan. 23, 1930.

No. 2376.

George D. Brabson, Sp. Atty., Bureau of Internal Revenue, of Washington, D. C. (Frederick H. Tarr, U. S. Atty., of Boston, Mass., and C. M. Charest, Gen. Counsel, Bureau of Internal Revenue, of Washington, D. C., on the brief), for the United States.

James S. Y. Ivins, of Washington, D. C. (Joseph D. Brady, of Holmes, Brewster & Ivins, of Washington, D. C., and Arthur W. Blackman, of Boston, Mass., on the brief), for appellee.

Before BINGHAM, ANDERSON, and WILSON, Circuit Judges.

WILSON, Circuit Judge. In 1887, the appellee, operating a railroad between Boston and Providence, experienced a very disastrous wreck on its lines, which resulted in the killing and injuring of a large number of people, and in damages from injuries to passengers and property amounting to $1,180,000, or more than one-fourth the amount of its paid-in capital stock.

While the appellee was then in a very prosperous condition, had a large earning power in proportion to its capital invested, its board of directors and a majority, at least, of its stockholders, became convinced that liability in case of accidents should be spread over a wider base, whereupon propositions for a lease of its railroad were invited by a committee of its stockholders appointed for the purpose. Several propositions were received, but the most favorable was that of the Old Colony Railroad Company, which offered to take over the appellee's railroad property on a lease for 99 years, and pay therefor an annual rental of $400,000 and a sum sufficient to pay the expenses of keeping the corporate organization of the lessor alive, and also agreed to keep the road in repair and its equipment in good condition, and pay all taxes and other assessments. It also agreed to pay the lessor in cash the sum of $1,300,000, and to create a sinking fund into which it would make annual payments sufficient to discharge, before the expiration of the lease, the funded and floating debt of the lessor, which amounted, when the damages resulting from the wreck in 1887 were settled, to the sum of $2,170,000. The lessee also expressly covenanted to apply the sinking fund in discharge of the lessor's indebtedness and pay any deficiency.

The cash payment of $1,300,000 was distributed among the stockholders of the appellee as a dividend in 1888. In 1893 the Old Colony Railroad Company assigned the lease to the New York, New Haven & Hartford Railroad Company, which will hereinafter be referred to as the New Haven Company, which assumed the obligation in the lease to establish a sinking fund for the liquidation of the funded debt of the

appellee during the life of the lease, and has continued to make the payments into the sinking fund as provided by the terms of the lease.

No question arose over the taxation of the income of the appellee until after the Revenue Acts of 1917 and 1918, U. S. Statute, vol. 40, cc. 63 and 18 (pages 300, 1057), defining war and excess profits and "invested capital" on which excess profits credit is computed.

Since the lease was made, the appellee up to 1918 had not carried on its books as an asset any item representing the obligation of the lessee to pay its funded debt; and, in making its return for 1918, the amount of its funded debt was not included in its "invested capital," presumably on the ground that borrowed capital is expressly excluded by the statute.

Its net income for the year 1918, according to its return, was $403,223.76, its invested capital was $4,186,956.20, and its excess profits credit was $329,956.50, which resulted in an excess profits tax of $21,980.18, which, added to its income tax of $45,509.23, made a total tax, according to its return, of $67,489.14, which it paid in that year.

In February, 1924, however, it filed with the Commissioner a claim for a refund on its 1918 tax, claiming, first, that the New Haven Road should have made a consolidated return and included the return of the appellee, in which case it claimed that its entire tax of $67,489.14 should be refunded, but which is not urged in these proceedings, and, in case of a separate return, that the "invested capital" of the petitioner should have been increased by the cash value of the agreement to pay its funded debt. If an increase in its invested capital to the amount of $916,000 is allowed, its excess profits credit would be increased to a sum in excess of its net income, and there would be no excess profits tax. It is now admitted, however, that its regular income tax should have been $48,146.85 instead of $45,509.23 as set forth in its return, and therefore, in case it had no excess profits tax, instead of $21,980.18, it was only entitled to a refund of $19,342.56, which it is seeking to recover by these proceedings.

The court below held: That the cash value of the agreement to pay the funded debt, which it found to be at least $2,000,000, should have been treated as a part of the petitioner's "invested capital"; that any appreciation in value of capital assets

may become a part of its earned surplus when the value of such increase in valuation is realized by a sale; that, by the agreement to pay the funded debt of the petitioner, an unearned or previously earned increment of the petitioner was realized; and its cash value should have been treated as "invested capital" for determining the petitioner's excess profits credit in 1918, and gave judgment for the petitioner to the amount of the refund claimed.

From the decision of the District Court, the government appealed, setting forth as errors: The finding of the court below that the agreement by the lessee to pay the funded debt had become a part of the "invested capital" of the petitioner; and a failure to rule that the value of the promise to pay the funded debt of the petitioner was not a part of the petitioner's invested capital; that it could not become invested capital of the petitioner unless it first became a part of its earned surplus and undivided profits; that it could not become a part of its earned surplus and undivided profits unless it was income; and that it had not become a part of its income on account of certain conditions contained in the lease.

The contention of the parties may be stated as follows: The petitioner contends that the agreement to pay the funded debt of $2,170,000 was a part of a bonus paid for making the lease, and was realized when the lease was made, or when the total of the funded debt was determined in 1893; that it was not rental, and that the payment in cash of $1,300,000 and the agreement to pay a debt of $2,170,000 should be treated as income received at least prior to 1894; and therefore the cash value of the agreement to pay its funded debt should be considered as a part of the "undivided profits" or "earned surplus" of the petitioner and should have been so carried on its books. The Government's contention is that the assumption of this indebtedness was not in the nature of a payment for the leasehold interest, but a part of the rental to be paid for the use of the property, and, even if the payment of its funded debt had not been based on what the government contends was a conditional promise, it should be prorated over the term of the lease; but it further claims, since by the terms of the lease no payment on account of the indebtedness is to be made, in case the lease is terminated without the fault of the lessee, or without the fault of either party, that it is not an absolute promise to pay

the debt of the petitioner, and therefore it cannot become due, or any part be prorated and become due, until the lease is fully carried out.

It is admitted by both parties that "invested capital" is a statutory concept and is defined by section 326(a) of the Revenue Act of 1918. The only part of the definition applicable to this case is contained in subdivision (3), viz: "Paid-in or earned surplus and undivided profits; not including surplus and undivided profits earned during the year." Thus, if the agreement to pay the funded debt of the petitioner has become "invested capital," it has become so because it may be treated as income received prior to 1894, and, not having been distributed, has become a part of its "undivided profits" or its "earned surplus," and so may be treated under the statute as "invested capital."

· The government's contention that it cannot be treated as income because of the condition contained in the lease, that, in case the lease was terminated without the fault of the lessee or of either party thereto, the obligation to pay the petitioner's funded debt should cease, we think cannot be sustained.

The cases cited by the government in support of its contention are instances in which the condition was precedent to any obligation attaching. Here the condition is a condition subsequent. Acting upon the presumption that all contracts will be observed and not broken, Wells v. Savannah, 181 U. S. 531, 545, 21 S. Ct. 697, 45 L. Ed. 986; Central Trust Co. v. Chicago Aud. Ass'n, 240 U. S. 581, 591, 36 S. Ct. 314, 60 L. Ed. 811, the Revenue Department has been accustomed to deal with such contingencies when they occur, and to treat such obligations and bills or accounts receivable as income in the year in which they are received, although upon certain contingencies, which may not occur, the full amount or cash value thereof may never be realized. Appeal of Manomet Cranberry Co., 1 B. T. A. 706; Appeal of Boston American League Baseball Club, 3 B. T. A. 149; Lewellyn v. Electric Reduction Co., 275 U. S. 243, 48 S. Ct. 63, 72 L. Ed. 262.

■■■ Neither do we think, if the agreement to pay the petitioner's funded debt can be treated as income, that it should be prorated over the term of the lease. An amount paid in advance as rental, or as a bonus for a leasehold interest, may be prorated by the lessee in computing his income tax over the period of the term, upon the ground that the interest acquired is an exhaustible capital asset, Galatoire Bros. v. Lines (C. C. A.) 23 F.(2d) 676; Alland & Bros. Inc., v. United States (D. C.) 28 F. (2d) 792, or is a part of the rental; but, as to the lessor in computing his tax, it is treated as income in the year in which received. O'Day Investment Co. v. Commissioner of Internal Revenue, 13 B. T. A. 1230; Miller v. Gearin (C. C. A.) 258 F. 225; Cryan v. Wardell (D. C.) 263 F. 248.

The crux of this case, of course, is whether the obligation to discharge the funded debt of the petitioner was income received in 1888, and, if so, whether its cash value in 1918 or any part of it could be treated as "invested capital" within the meaning of the Revenue Act.

A building erected on leased land under a covenant in the lease that it shall become and remain a part of the realty and the property of the lessor is treated by the Revenue Department, and properly so, as income of the lessor, presumably upon the ground that, on becoming a part of the realty, it has enhanced the value of the lessor's property to the amount it has added to its fair market value; and, while its cost as to the lessee may be treated as so much rental and be spread over the entire term of the lease in computing his income tax, the fair market value it has added to the lessor's property is taxable to the lessor in the year in which the building was constructed. Miller v. Gearin, supra; Cryan v. Wardell, supra.

■ While the case is not entirely free from doubt, we think the obligation to discharge the funded debt of the petitioner in this case was properly treated by the court below as income received when the lease was signed, at least to an amount equal to the fair cash value of the obligation.

By the assumption of its funded indebtedness, including the amount of the damages suffered from the accident in 1887, by a responsible third party as a part consideration for a leasehold interest in its properties, whether the obligation be viewed as so much additional rental or otherwise, a value was added to the net assets of the petitioner equal to the cash value of the obligation, which the court below found to be at least $2,000,000.

While a portion of this sum, it is true, represented the loss suffered by reason of the accident, and therefore could not be

treated as "invested capital" under the rule established in Willcuts v. Milton Dairy Co., 275 U. S. 215, 48 S. Ct. 71, 72 L. Ed. 247, it appears, in arriving at the petitioner's "invested capital" in 1918, no part of the cash value of this obligation was added to its assets, but that not only the amount of the losses suffered, which is now represented in the petitioner's funded debt, but also its "borrowed capital," which makes up the remainder of its funded debt, was deducted from its total assets.

Having once deducted the sum representing the losses suffered from the accident as a part of its funded debt, the total cash value of the obligation should have been added to its assets in arriving at its "invested capital" in 1918.

A correct accounting method, of course, would have been to have carried on its books in some form as an asset this obligation to pay its funded debt, and in determining its "invested capital" in 1918 to have added to its capital assets the difference between the amount of the loss and the cash value of the obligation, and to have then deducted from the total assets only so much of the funded debt as represented "borrowed capital," plus any other liabilities, and added the difference between the losses arising from the accident and the cash value of this obligation. The result, however, is the same, and results in an excess profits credit in excess of its net income, and hence no excess profits tax should have been assessed against the petitioner in 1918.

The judgment of the District Court is affirmed.

ANDERSON, Circuit Judge, concurs in the result.