### ASSOCIATED ELECTRIC CO. v. UNITED STATES.

No. 47290.

United States Court of Claims.

June 5, 1951.

822

Jerome R. Hellerstein, New York City (Hellerstein & Rosier, New York City, was on the briefs), for the plaintiff.

H. S. Fessenden, Washington, D. C., (Theron Lamar Caudle, Asst. Atty. Gen., Andrew D. Sharpe, Special Asst. to the Atty. Gen., on the brief), for United States.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN and HOWELL, Judges.

HOWELL, Judge.

Plaintiff sues to recover undistributed profits surtax and interest thereon, assessed against it by the Commissioner of Internal Revenue for the year 1936, and paid by plaintiff on April 11, 1942, in the amount of $51,233.39.

Plaintiff contends that it is entitled to the refund claimed by virtue of Section 26(c) (1) of the Revenue Act of 1936, 49 Stat. 1648, 26 U.S.C.A. Int.Rev.Acts, page 836, which allows a credit for amounts which cannot be paid out as dividends without violating an express provision of a written contract executed prior to May 1, 1936. Plaintiff urges that such a restriction on the payment of dividends is contained in its trust indenture executed in 1926, in the provision prohibiting the payment of dividends "except out of earnings or surplus accrued from earnings"; that the amount on which the Commissioner assessed the surtax did not constitute "earnings" within the meaning of the indenture; that at the beginning of 1936 plaintiff had a deficit in "surplus accrued from earnings," and that its "surplus accrued from earnings" during 1936 did not exceed the amount of undistributed surtax net income on which it paid the surtax with its return.

Defendant contends that the amount in question was available for distribution as dividends under the terms of plaintiff's indenture and that plaintiff's surplus available for distribution as dividends was suf-

ficient in 1936 to make inapplicable the provisions of Section 26(c) (1) of the Revenue Act of 1936.

The details of the various transactions underlying the amount in question are set forth in full in the findings and will only be repeated to the extent deemed necessary for an understanding of the issues involved and the arguments of the parties.

Section 26(c) of the Revenue Act of 1936 provides for credits of corporations against undistributed profits in part as follows: "(1) *Prohibition on payment of dividends.* An amount equal to the excess of the adjusted net income over the aggregate of the amounts which can be distributed within the taxable year as dividends without violating a provision of a written contract executed by the corporation prior to May 1, 1936, which provision expressly deals with the payment of dividends. * * *" 49 Stat. 1664.

Under a trust indenture executed April 1, 1926, by plaintiff and the National Bank of Commerce in New York, as trustee, plaintiff became obligated for the payment of $75,000,000 of bonds which were outstanding in 1936. Article V, "Certain Covenants of the Company," Section 10, provided as follows:

The Company covenants and agrees that it will not declare or pay any dividends on its stock except out of earnings or surplus accrued from earnings.

In the determination by the Commissioner of Internal Revenue of plaintiff's income for the year 1936, there was included a "profit" of $400,283.75 from the sale and exchange of plaintiff's investments in the American Utilities Company. Plaintiff concedes that, for income tax purposes, this profit was realized, and it is not seeking to recover the income tax nor the excess profits tax assessed and paid thereon. For the purpose of surtax on undistributed profits, Section 14 of the Revenue Act of 1936, 26 U.S.C.A. § 14, however, plaintiff insists that the "profit" on the American Utilities Company transaction was not available for distribution as dividends because of the restriction contained in Section 10 of Article V of the above-mentioned indenture.

The questions thus presented are, whether the amount in question constitutes "earnings" within the meaning of the indenture, and whether plaintiff had available for distribution in 1936 "surplus accrued from earnings."

Plaintiff was a public utility holding company. It was subordinate to and controlled by the Associated Gas and Electric Corporation, another holding company, which held all of plaintiff's capital stock. Plaintiff was affiliated with a group of companies that were owned by the Associated Gas and Electric Company. Plaintiff's corporate purpose and principal business was the investment of its funds in the common stock and other securities of public utility companies for the purpose of deriving the benefit of income in the form of dividends and interest from the companies whose securities it owned and held. These investments were the assets which it employed in the normal course of its business to secure its object of profit. It was not engaged in the business of acquiring securities of other companies for the purpose of resale.

During the years 1931 and 1932 plaintiff acquired a large amount of the bonds and other items of American Utilities Company and its subsidiaries. American Utilities Company was a public utility holding company owning investments in public utility operating companies. The American Utilities Company investments were acquired by plaintiff through plaintiff's parent company and other associated companies. The cost of these investments to plaintiff was in excess of their cost basis to plaintiff's parent and affiliates. In 1936 plaintiff acquired additional securities of American Utilities Company through plaintiff's affiliated companies. In June 1936, the American Utilities Company was dissolved pursuant to a court order. Under the approved dissolution agreement, plaintiff became entitled to receive certain debentures of its parent company. Plaintiff never received these interest bearing debentures, but in lieu thereof, plaintiff acquired open accounts from its subsidiaries and an affili-

ated company, to which companies the assets of American Utilities Company had been transferred pursuant to an agreement between the parties. The face value of these open accounts which plaintiff received in exchange for its investments in American Utilities Company, and which were stipulated as to fair market value, was in excess of the original cost bases of the American Utilities Company investments to plaintiff's parent and affiliated companies. For the purposes of this suit, the amount of that excess is stipulated to be $400,283.75. It is this amount which defendant insists is an undistributed profit in plaintiff's hands in 1936 which plaintiff could have, but did not, distribute as dividends.

The indenture executed in 1926 by plaintiff and the trustee for the benefit of plaintiff's bondholders, was clearly a "written contract" within the terms of Section 26(c) (1) of the Revenue Act of 1936, and Section 10 of Article V "expressly deals with the payment of dividends." It is conceded by the parties that in order for the profits in question ($400,283.75) to be available for distribution as dividends, they must constitute "earnings" within the meaning of plaintiff's indenture. It is also conceded that these profits resulted from the sale and exchange of some of plaintiff's capital assets. It is plaintiff's position that the term "earnings" as used in the indenture means the excess of the income derived from the company's business operations over the expenses of operations, and that it does not include any profits realized on the sale or exchange of plaintiff's capital assets.

It is defendant's contention that the term "earnings" as used in the indenture, includes not only net income from operations, but also any profits realized as a result of capital transactions. Defendant argues that the parties to the indenture must have so intended, because from the time the indenture was entered into in 1926 through 1936, the New York Stock Corporation Law [1] permitted the payment of dividends out of capital gains. Thus defendant urges that the indenture was designed to permit the declaration of dividends from surplus arising from capital gains as well as from earnings, but defendant seems to concede that the indenture prohibits the declaration of dividends from paid-in surplus and from surplus arising from the upward revaluation of capital assets, even though New York law permits the declaration of dividends from the latter two types of surplus. In further support of its position, defendant states that there is no valid distinction between the terms "earnings" and "profits" under New York law and that, therefore, the profit in question cannot be excluded from the meaning of the term "earnings" in plaintiff's indenture.

It seems to us a somewhat strained interpretation of the language of plaintiff's indenture to say that in using the simple term "earnings" the parties to the indenture intended to indicate two of the sources (earnings from operations and profit on capital transactions) but not all of the sources from which dividends are payable under New York law, particularly when none of the terms used in the New York law are used in the indenture. [2] We had supposed that restrictions imposed by state

1. McK.Consol.Laws, Chapter 59, Article 6, Section 58, New York Stock Corporation Law.

2. Section 58 of the New York Stock Corporation Law provides in part as follows:

"*Dividends*. No stock corporation shall declare or pay any dividend which shall impair its capital or capital stock, nor while its capital or capital stock is impaired, nor shall any such corporation declare or pay any dividend or make any distribution of assets to any of its stockholders, whether upon a reduction of the number of its shares or of its capital or capital stock, unless the value of its assets remaining after the payment of such dividend, or after such distribution of assets, as the case may be, shall be at least equal to the aggregate amount of its debts and liabilities including *capital or capital stock as the case may be.* * * *"

Plaintiff was a Delaware corporation licensed to do business in New York. The parties agree that plaintiff was at all times subject to the New York Corporation Law with respect to its operations in New York.

corporation law set the minimum standard regarding the payment of dividends applicable to corporations doing business in the state, but that the corporation might, if it saw fit, impose upon itself, by charter, by-laws or contract, more stringent regulations. If the bondholders of plaintiff company had been content with the protection afforded them by the dividend restrictions imposed by New York law, it would not have been necessary to include in the indenture any provision regarding dividends.[3] If, as defendant seems to contend, they wished to limit the payment of dividends to payment out of two of the sources mentioned in the New York law, it would have been a simple matter to do so by using the expression "surplus derived from undistributed profits but not from paid-in surplus or capital surplus created by increment in value of capital assets." Instead, the indenture used the expression "earnings and surplus accrued from earnings." Unless the two expressions are synonymous, we see no reason to suppose that the parties to the trust indenture intended to paraphrase a portion of the New York Corporation Law relating to the payment of dividends.

■■ We do not believe that the expressions are synonymous. The terms "surplus" and "profits" are both much broader in concept than the term "earnings." A surplus may result from a number of different circumstances and generally a corporation will keep several surplus accounts. A surplus may be created on the upward revaluation of a capital asset, such as a building. On the company's books this might be recorded by increasing the book value of the particular asset with a corresponding increase or credit to a capital surplus account. This increase in valuation does not constitute a "profit" since a profit results only from a completed transaction with an outside party. On the sale or exchange of the same capital asset where more is received by the company than the amount recorded as book value, a profit is realized which may likewise be credited to an earned surplus account.[4] Neither of the above transactions will clear through the company's income statement although the latter may be noted therein. Upon the changing of the stated value of a company's capital stock, a credit would be entered in the capital surplus account; or where a fixed par value is established for capital stock, any sale of such stock at a price above the fixed par value, is credited to the capital surplus account since the excess is regarded as paid-in capital and not profit.

■ Earnings are customarily understood as the income from the company's operations and they are reflected first in the company's operating or income and expense account which is a periodic account. At the end of each period, the account is closed and the resulting net earnings or loss is credited or charged to an earned surplus account with appropriate identification.

■ "Profit" is a more inclusive term than the term "earnings." Net earnings realized at the end of an accounting period constitute the company's profit on its operations. The gain from the sale or exchange of a capital asset also is a profit.

The plaintiff company was a public utility holding company. Its assets consisted largely of investments in the stocks, bonds,

---

3. Trust indentures to secure creditors of a corporation such as the indenture in suit, usually include provisions specifying the conditions under which dividends may be paid as one of the special covenants which would give occasion for declaring a default before there has been a default in the payment of interest or principal. These restrictions are more stringent than those imposed by the applicable state statutes, and will fix, for the life of the indenture, the company's ability to pay dividends regardless of any change in the state laws, unless, of course, the laws become more restrictive than the covenant in the indenture. See Bogert, Trusts and Trustees, Vol. 2, § 246, par. 7, p. 788, Vol. 5, § 1088, Section 5, p. 3279; Ballantine on Corporations (Rev.Ed.1946), p. 497; Fletcher, Cyclopedia Corporations (Per. Ed.1933), Vol. 19, § 9131, p. 344.

4. This surplus is sometimes credited to another surplus account but if so, it will be identified so as to distinguish it from earnings.

notes, and open accounts of its own operating subsidiaries. It also held the bonds notes, and open accounts of American Utilities Company and its operating companies. Plaintiff's earnings were represented by the interest and dividends received by it from its investments in subsidiary and associated companies. These investments of plaintiff company are comparable to the fixed assets, such as land, buildings, and plant, of an industrial company. Upon the sale or exchange of such investments, any resulting gain or profit does not represent "earnings" of the plaintiff company and should not appear in its income and expense account for the period in which the transaction occurred. Such a profit might appear in a summary statement of income made at the end of a period of operations but would be qualified by a notation as to the character of the transaction. Such a profit on the sale or exchange of plaintiff's investments (assets) might be credited to a capital or to a corporate (earned) surplus account. The accumulations of such profits would not represent a surplus accrued from earnings because such profits themselves were not earnings.

In most states, realized surplus of whatever nature is available for distribution as dividends in the absence of some restriction in the corporate charter, by-laws, or in contracts (with preferred stockholders or with bondholders).

Courts have taken great care in distinguishing "net earnings" from other types of surplus in their interpretations of state laws governing the payment of dividends, and in construing contracts, by-laws and charters containing dividend clauses. In United States v. Riely et al., 4 Cir., 1948, 169 F.2d 542, 543, the court was called upon to interpret a Virginia statute authorizing the payment of dividends by corporations "out of net earnings, or out of its net assets in excess of capital." For the year in question, the taxpayer-corporation had net earnings but they were not sufficient to restore its capital deficit. No corporate creditors were involved. The court said, in part:

"If a pure analytical approach be employed, clearly there was here no prohibition of the declaration of dividends. The Statute is couched, not in the terms of a negative prohibition, but rather in the terms of positive authorization. Directors of a corporation are empowered to declare and pay dividends 'out of net earnings, or out of its net assets in excess of its capital.' Manifestly, net earnings (on the one hand) and excess of assets over capital (on the other hand) are utterly and absolutely distinct and separate. Either may exist, or not exist, as to a specified period, with, or without, the other.

"The words 'net earnings' are followed by a comma; then, before the words 'out of its net assets in excess of its capital' comes the disjunctive conjunction 'or'. As the English language is rationally used, this would seem to imply two separate sources of dividends ((1) net earnings; and (2) excess of assets over capital), each with no relation to, no connection with, the other. * * *

"Net earnings are defined in Webster's New International Dictionary as 'Excess of earnings over expenses, sometimes including interest charges, during a given period.' In Ballentine's Law Dictionary we find: 'The net earnings of a business have been defined as the gross receipts less the expenses of operating the business to earn such receipts.' States Black's Law Dictionary (followed by a long citation of supporting cases): 'Net earnings are the excess of the gross earnings over the expenditures defrayed in producing them, and aside from and exclusive of capital laid out in constructing or equipping the works or plant.' In none of these definitions is any mention made of excess of assets over capital as an inseparable concomitant of, or even as having any relation to, net earnings."

The Circuit Court then cited several cases in which the term "net earnings" was defined and distinguished from profits of various types and surpluses: Union Pacific Railroad Co. v. United States, 99 U.S. 402, 25 L.Ed. 274; Mobile & Ohio Railroad Co. v. Tennessee, 153 U.S. 486, 14 S.Ct. 968, 38

L.Ed. 793; New York, Lake Erie & Western Railroad v. Nickals, 119 U.S. 296, 7 S.Ct. 209, 30 L.Ed. 363. Later in the opinion the court, 169 F.2d at page 545 distinguished the terms "net profits" and "net earnings" citing Mengel Co. v. Glenn, D.C., 50 F.Supp. 765, affirmed 6 Cir., 145 F.2d 235, and quoting from Lich v. United States Rubber Co., D.C., 39 F.Supp. 675, as follows: "Where capital is impaired, annual net earnings, if insufficient to offset the impairment, do not constitute net profits. * * * The term net profits is not synonymous with the term annual net earnings."

In the Riely case, the court goes on to say, 169 F.2d at page 545: "While, in Willcuts v. Milton Dairy Co., 275 U.S. 215, 48 S.Ct. 71, 72 L.Ed. 247, the gist of Mr. Justice Sanford's opinion is clearly indicated, 275 U.S. at page 218, 48 S.Ct. at page 72, * * * where he says: 'But it is a prerequisite to the existence of "undivided profits" as well as a "surplus," that the net assets of the corporation exceed the capital stock.' Surely neither 'undivided profits' nor 'surplus' is synonymous with the term 'net earnings' used in the Virginia Statute."

In Agnew et al. v. American Ice Company et al., 2 N.J. 291, 66 A.2d 330, 10 A.L.R.2d 232, the articles of incorporation provided for payment "out of the surplus or net earnings of each fiscal year" of a noncumulative dividend on the preferred stock at a specified rate, before any dividend could be paid on the common stock for that year. It was held that annual net accretions to surplus, not a part of annual net earnings, were not a proper source of dividends on the preferred stock.

It has frequently been necessary for the courts to examine carefully into the source of corporate dividends in determining the right to a dividend as between the life beneficiary and the remainderman of a trust. In general, it has been held that dividends paid out of the company's earnings from operations go to the life beneficiary whereas dividends paid out of capital gains go to the remainderman. See 130 A.L.R., annotations beginning on page 492.

Although the indenture in the instant suit did not use the term "net earnings," its use of the term "earnings" must have meant "net earnings" since a company does not have any "earnings" unless its income from operations are in excess of its operating expenses for a particular period. We are convinced that plaintiff, by its use of the term "earnings" rather than the term "profits," meant the excess of its income from operations over and above operating expenses. That is the meaning usually and normally given to the term by business executives and accountants, particularly in connection with the recording of business transactions, and, as we have shown, it is the meaning understood by the courts and legal text writers in the field of corporate law. The gain here in question, which defendant would tax as undistributed profits, was a gain or profit from the exchange of a capital asset and did not constitute an "earning" of plaintiff company.[5]

---

**5.** As to whether or not a true profit was realized on this transaction in American Utilities Company investments, we do not believe that profits are acquired by the simple expedient of transferring assets from one corporation to another through the control of one common parent corporation, as here. Both the purchase and the sale are controlled by the same board of directors of the head company. Arbitrary values placed upon assets so transferred could readily deplete the true asset values of any one of the group without changing the face value of its book accounts and without the declaration of any dividend by such company. The payment of dividends from profits arising from the exchange of assets within a group of affiliated companies would afford little protection to the bondholders who must look for repayment to the assets of only one member of such group that was committed to pay these bonds. In the chapter on Accounting Statements, Ballantine on Corporations (Rev.Ed.1946) states, at page 548:

Good accounting practice does not recognize any profit solely on inter-company transactions. Thus if one of the subsidiaries has sold shares or goods to another subsidiary at a price above

In its brief, defendant makes a further argument in support of its position, as follows: The payment of a purchase price to its direct or indirect parent company in excess of the actual market value is in effect a distribution without the formal declaration of dividends. Thus, the taxpayer is in no position to complain about the Commissioner's determination of profit in 1936 and that this profit was available for distribution as dividends, since it had distributed the profits in the guise of excess purchase price.

This argument appears to void the premises upon which the assessment was made by the Commissioner. If, as the Government argues, the plaintiff effectively distributed its assets to its parent company when these investments were acquired through the medium of an excess purchase price, it could not properly make a further distribution when these investments were later exchanged for book accounts which merely restore the original asset values.

■ Since the amount in question does not represent "earnings" of plaintiff company, it was not available for distribution as dividends and plaintiff was entitled to the credit provided for in Section 26(c) (1) of the Revenue Act of 1936.

Plaintiff advances one further contention. It urges that if the court should accept defendant's theory that "surplus accrued from earnings" means "earned surplus," the record shows that plaintiff's deficit in earned surplus at December 31, 1935, was so large that the gain in question would still leave a large deficit in such earned surplus. It is conceded by plaintiff (for the purposes of this argument) that "earned surplus" would include profit from the sale or exchange of capital assets as well as profits accrued from operations. If we accept defendant's theory that the profit of $400,283.75 on the sale and exchange of plaintiff's investments in American Utilities Company should have been credited to plaintiff's corporate surplus ac-

count in 1936 (plaintiff did not maintain an "earned surplus" account but its "corporate surplus" account was a similar type of account), all of plaintiff's transactions which were similar in nature to the ones involving American Utilities Company investments, would have to be scrutinized to determine whether or not there was a surplus balance as of December 31, 1935, in plaintiff's corporate surplus (earned surplus) account.

Plaintiff's accounts were not properly stated and its bookkeeping was far from orthodox. Plaintiff's actual books of account are not in evidence and arguments advanced by both parties regarding the probable state of an earned surplus account, had such an account been actually kept, are hypothetical, and we shall not attempt to resolve them. However, on the basis of the record which is before us, we have found that in 1931 plaintiff had reduced its capital account by the transfer of $30,000,000 to its capital surplus account, and by the end of 1935, its capital surplus balance had been depleted by over $20,000,000 to a balance of $9,741,676. In 1931, plaintiff charged against its capital surplus account, losses of over $10,000,000 upon the sale of its investments in the capital stock of American Utilities Company and Southern Ice Company. Had this loss on investments been charged to plaintiff's *corporate* surplus account (earned surplus), there would have resulted a substantial deficit at the end of 1935. We cannot determine the exact amount of that deficit, but it is clear that it was greatly in excess of $400,283.75.

Judgment will be entered in plaintiff's favor against defendant for $51,233.39, plus interest at six percent per annum from April 11, 1942, in accordance with Section 804 of the Revenue Act of 1936, Sec. 3771(a) (2) of the Internal Revenue Code, 26 U.S.C. § 377.

It is so ordered.

cost this will show a profit on the books of the seller. But if the securities or goods have not yet been sold to an outsider, the group of corporations as a whole has realized no profit. The goods

are still in the hands of the group and to show profits on such a transaction would be similar to allowing an individual corporation to show a profit by marking up unsold goods.

JONES, Chief Judge, and MADDEN, and LITTLETON, Judges, concur.

WHITAKER, Judge, dissenting.

Plaintiff was a holding company. Its entire operations consisted of holding and dealing in the stocks of other companies. Its stock in trade was the stock of other companies. Its income was derived altogether from such activities. Under such circumstances, at least, I think profits derived from a sale of stock in one of its subsidiaries is "earned income."