A. M. BYERS CO., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 7451.   Promulgated April 22, 1930.

*W. W. Spalding, Esq.*, for the petitioner.
*A. George Bouchard, Esq.*, for the respondent.

662

664

### OPINION.

MORRIS: The two major issues in this case present questions of fact relative to valuations of assets. At the comparatively late date of January 29, 1918, a valuation is required for the purpose of computing the allowable deductions from income by way of allowances for exhaustion, wear and tear. The dates of valuation effective for invested capital purposes are much earlier, going back to the year 1903 for some of the values, and to 1909 for others. Included in the evidence is a detailed retrospective appraisal of the "depreciated normal costs" based upon cost of reproduction new with allowances for depreciation. In connection with this appraisal and with another made upon the basis of a physical inventory in the

middle of 1917, a few months prior to the transfer of the assets to the petitioner, there has been an ascertainment of additions subsequent to acquisition and the cost thereof. The cost of the additions is acceptable. The situation is similar with reference to the value of the assets in 1918, where the conclusion hereinafter reached is considered amply sustained by the record. Cf. *Georgia Manufacturing Co.*, 5 B. T. A. 893; *Donaldson Iron Co.*, 9 B. T. A. 1081. Relative to the valuations in the earlier years, we do not find the evidence so convincing and we are not satisfied that the beginning values shown in the appraisal are sufficiently supported to enable a recognition of them. Cf. *Rockford Malleable Iron Works*, 2 B. T. A. 817; *Tibby-Brawner Glass Co.*, 2 B. T. A. 918. The land values determined are upon the testimony of qualified witnesses. We have included whatever values are allowable upon the record. For the reasons stated they fall a little short of the claims of the petitioner, nevertheless in our opinion any question of abnormality of capital is removed.

The first issue relates to the computation of allowances for exhaustion, wear and tear which are deductible from income in the taxable years as provided in section 234 (a) (7) of the Revenue Act of 1918. The rate of annual depreciation is not in dispute. The amount of the base to which the annual rate is applied is at issue. The petitioner alleges in the amended petition that the proper base for the six-month period following acquisition, and therefore ended June 30, 1918, amounts to an average of $3,728,415.56. Since the additions to cost during the period amounted to $112,762.18, one-half thereof is deductible from the claimed base, and the alleged amount of value at acquisition is $3,672,034.47. In support of this value there is in evidence a physical inventory, taken in the middle of 1917, a few months prior to the transfer, which removes all reasonable doubt of the actual existence of the assets claimed to have been acquired; a current professional appraisal of the cost of reproduction new, and of the " sound value " of the assets after deducting allowances for depreciation; a retrospective appraisal of later date; in addition, the testimony of witnesses qualified to express opinions of some weight in the determination of the values. Upon a consideration of all of this evidence we are convinced that the fair market value of the depreciable assets amounted to at least the amount claimed, $3,672,-034.47, and that is the proper base, together with due consideration of the cost of subsequent additions, upon which the amounts of the allowances should be computed as affording deductions which will be entirely reasonable.

The second issue relates to the amount of value allowable for invested capital purposes, under the Revenue Act of 1918, for various

properties turned in for capital stock, par value $5,000,000 issued on January 29, 1918. It is admitted that an interest and control of 50 per cent or more remained in the same persons after the transfer and the value allowable is limited under the provisions of section 331 of the Revenue Act of 1918.

The assets were transferred to the petitioner by three persons, whose interests in the assets were equal and similar. Each owned a one-fourth interest acquired under the will of Alexander M. Byers, and a one-twelfth interest acquired upon the death of a brother, Dallas C. Byers. Subsequent to acquisition there were various additions to the assets originally acquired. With respect to any one of the assets the dates of acquisition by each of the three persons were the same. It is apparent then, that the question requires the determination of the cost of a three-fourths interest and of a one-fourth interest, with due consideration being given to the life interest held by the mother until August, 1912, and to subsequent additions to the properties, and to reasonable allowances for depreciation.

Alexander M. Byers died in 1900, leaving a will conveying all his property to trustees, with authority to continue two businesses, until the date when the youngest child should reach his majority. The youngest child reached the age of twenty-one years in 1902; in 1903 the properties were conveyed by the trustees under the will to the surviving four heirs. Properties which were located at Girard were owned solely by the decedent. Properties located at Pittsburgh were owned by a corporation of a somewhat similar name to that of petitioner; the decedent owned all of the capital stock thereof, and transfer of the Pittsburgh properties was effected in 1903 directly from the corporation to the four heirs as distributions, in liquidation to stockholders.

For the purposes of ascertaining the cost of the three-fourths interest, the petitioner claims that the values of the assets in 1903 are the allowable acquisition costs to the heirs. In this we agree with reference to the Pittsburgh properties which were owned by a corporation and were distributed to the stockholders in 1903, but with reference to the Girard properties the question arises whether under the terms of the will the properties were acquired in 1900 when the decedent died, or in 1903 when the trustees under the will conveyed the properties to the heirs. However, the record does not establish to our satisfaction the value of the Girard properties in either 1900 or 1903, and we see no reason for increasing the value which the respondent has allowed as of either of those dates. After a careful consideration of the evidence we conclude that the cost of the depreciable assets, after deducting a reasonable allowance for depreciation, amounted for the Girard properties to at least

$963,649.04, and for the Pittsburgh properties to at least $1,459,-678.83. With respect to the lands at Girard, the respondent has included subsequent acquisitions which cost $119,767.16, and this cost should also be allowed.

For the purpose of ascertaining the cost of the one-fourth interest which was acquired from Dallas C. Byers, the petitioner claims an amount of appreciated value for all of the assets, including the depreciable assets and the Girard lands, due to a general increase in values. Petitioner admits that the Girard properties were acquired by the three surviving heirs immediately upon the death of Dallas C. Byers in 1909, but it is claimed that the mother was left a life interest in the Pittsburgh properties and the year of her death, 1912, was the proper date of valuation of the Pittsburgh properties. It is true that the three surviving heirs did not acquire the personal property at Pittsburgh until it was distributed to them in 1912. As to the real estate at Pittsburgh, there is nothing before us to show that the property did not vest in the heirs in 1909. *Manderson* v. *Lukens*, 23 Pa. 31; 62 Am. Dec. 312; *In re Long Estate*, 77 Atl. 924; *Schofield* v. *Olcott*, 11 N. E. 352; *Armstrong* v. *Barber*, 88 N. E. 246; *Flanner* v. *Fellows*, 68 N. E. 1057; *Pengery* v. *Rulom et al.*, 92 N. E. 592; *Smith Estate*, 75 Atl. 425.

As will presently appear, for the Pittsburgh lands, we have determined from the evidence the values of the lands in 1903 and in 1909, thus disposing of the issue in part, but with regard to the depreciable assets at both Girard and Pittsburgh, and also the lands at Girard, the record does not afford a basis upon which we can allow any increase in value. The cost of the depreciable assets and of the Girard lands remains the same for the purpose of determining the cost of the one-fourth interest as was determined for the purpose of computing the three-fourths interest.

With respect to the Pittsburgh lands, we are well satisfied that the prices per square foot in 1903 and again in 1909, together with the subsequent additions at cost, all as set out in detail in the findings, are properly allowable as the costs of the respective interests. In the absence of evidence of the value of the Water Street land in 1909, we find no greater allowable value at any time than $10 per square foot as shown in the findings.

The third issue was abandoned by the petitioner. See *Russel Wheel & Foundry Co.*, 3 B. T. A. 1168.

The fourth issue raises the question of the proper adjustment of earned surplus, for invested capital purposes, on account of depreciation of prior years in respect of properties acquired after March 3, 1917, when the basis for computing the depreciation is greater than

the limited value at which such properties may be included in invested capital under section 331 of the Revenue Act of 1918.

The allowances which respondent has made for depreciation of the properties acquired by petitioner on January 29, 1918, are based upon a fair market value, as of the date of acquisition, of $2,816,002.17. In computing invested capital, respondent, acting in accordance with the provisions of section 331, included such properties at a value alleged to equal cost to the previous owners, which is less than $2,816,002.17. The earned surplus of each year was reduced for invested capital purposes by the entire amount of depreciation allowed.

We have found that the fair market value of the depreciable properties acquired on January 29, 1918, was, at that date, $3,672,034.47. That value is the basis for computing the annual deductions for depreciation of the properties. We have found that the cost of the properties to the previous owners was $2,423,326.87. That amount represents the value at which these properties may be included in invested capital under the limitations of section 331.

There is no dispute between the parties as to the remaining life from date of acquisition of the depreciable properties acquired on January 29, 1918. It was fixed at 15 years by respondent, and the petitioner agrees. The annual deduction for depreciation of these properties which petitioner is entitled to make in computing net income, assuming that no unforeseen events may occur during the 15-year period to materially affect the life of the properties, is one-fifteenth, or 6⅔ per cent, of $3,672,034.47, or $244,802.30. If the provisions of section 331 were applicable for depreciation purposes, so as to restrict the basis to the limited value at which the properties may be included in invested capital, the annual deduction for depreciation would be one-fifteenth, or 6⅔ per cent, of $2,423,326.87, or $161,555.12.

It is the contention of the petitioner that, while it is entitled to make an annual deduction for depreciation in computing net income, of $244,802.30, its earned surplus, for invested capital purposes, should be reduced by only $161,555.12, the difference between these amounts representing realized appreciation. Neither the pleadings nor the brief present the reasoning behind this contention. The petitioner merely asserts that its contention accords with " the recognized rule," and relies upon article 844 of Regulations 45 as authority for its position.

Article 844 of Regulations 45 reads as follows:

*Surplus and undivided profits: reserve for depreciation or depletion.*—If any reserves for depreciation or for depletion are included in the surplus account it should be analyzed so as to separate such reserves and leave only real sur-

plus. Reserves for depreciation or depletion can not be included in the computation of invested capital, except to the following extent:

(1) Excessive depletion or depreciation included therein and which if charged off could be restored under article 840 may be included in the computation of invested capital; and

(2) Where depreciation or depletion is computed on the value as of March 1, 1913, or as of any subsequent date, the proportion of depreciation or depletion representing the realization of appreciation of value at March 1, 1913, or such subsequent date, may if undistributed and used or employed in the business be treated as surplus and included in the computation of invested capital.

For the purpose of computing invested capital depreciation or depletion computed on the value as of March 1, 1913, or as of any subsequent date shall, if such value exceeded cost, be deemed a pro rata realization of cost and appreciation and be apportioned accordingly. Except as above provided value appreciation (even though evidenced by an appraisal) which has not been actually realized and in respect of amounts accrued since March 1, 1913, reported as income for the purpose of the income tax, can not be included in the computation of invested capital, and if already reflected in the surplus account it must be deducted therefrom.

Apparently the petitioner sees in the circumstances of its case a situation bearing such a close analogy to those to which paragraph (2) of the above quoted article relates, as to bring it within the provisions of the article. But in that it is mistaken. It seems entirely clear that the regulation applies only when the statute recognizes a value for computing the deduction for depreciation or depletion in excess of the cost of the property. Two such instances which are readily called to mind are when the March 1, 1913, value of depreciable property exceeds cost, and when the discovery value of natural deposits is materially disproportionate to cost. In those instances the statute allows a deduction for depreciation or depletion based upon the higher value, so that the deduction allowable is greater than that necessary to return to the taxpayer its capital investment in the property consumed in the business. The purpose of the statute in allowing the higher values as the bases for depreciation and depletion is, of course, to enable the taxpayer to recover the March 1, 1913, value of its property or the discovery value of natural deposits, free from tax. To the extent that the deduction is greater than that necessary to recover the cost of the property consumed, it includes the nontaxable increment in value of the property, and this is what is known as " realized appreciation."

When property is used up in the business, earned surplus and undivided profits are affected only to the extent that capital has been consumed or lost. So, if the annual deductions for depreciation and depletion which include the nontaxable increment in value of the property have been charged against earned surplus and undivided profits account, in their entirety, that account has been reduced to a point where it is less than the true earnings of the business. That

is the situation which article 844 of Regulations 45 was intended to rectify.

In the instant case the annual deduction for depreciation of the properties acquired on January 20, 1918, for shares of capital stock, will be based upon the fair market value of the properties at the date of acquisition, said value representing cost to the petitioner. In that situation, the annual deduction for depreciation will not be greater than that necessary to return to the petitioner its capital investment in the property used up in the business, and, therefore, will include no element of nontaxable increment in value. In that very material respect does the petitioner's case differ from those contemplated by article 844.

Furthermore, only true earned surplus and undivided profits can be included in the computation of invested capital. *Milton Dairy Co.* v. *Willcuts*, 8 Fed. (2d) 178; and *Willcuts* v. *Milton Dairy Co.*, 275 U. S. 215. A true earned surplus can not exist unless provision has been made for all of the expenses and losses of the business. The rule is well stated in article 838 of Regulations 45, which, so far as material here, reads as follows:

*Surplus and undivided profits; earned surplus.* Only true earned surplus and undivided profits can be included in the computation of invested capital, and if for any reason the books do not properly reflect the true surplus such adjustments must be made as are necessary in order to arrive at the correct amount. In the computation of earned surplus and undivided profits full recognition must first be given to all expenses incurred and losses sustained from the original organization of the corporation down to the taxable year, including among such expenses and losses reasonable allowances for depreciation, obsolescence, or depletion of property (irrespective of the manner in which such property was originally acquired), and for the amortization of any discount on its bonds.

In *Willcuts* v. *Milton Dairy Co.*, *supra*, the Supreme Court expressed the opinion that the above quoted article correctly interpreted section 326 of the Act as it related to the inclusion in invested capital of earned surplus and undivided profits.

Here, the properties acquired on January 20, 1918, cost the petitioner $3,672,034.47. The parties agree that the life of these properties from date of acquisition is 15 years. Based upon those facts, the petitioner's capital investment in the properties is being consumed or used up at the rate of $244,802.30 per annum. The petitioner can not have any true earned surplus without adequate provision being made for this consumption of capital. The issue must be decided adversely to the petitioner.

The fifth issue is disposed of by our decision on the second issue.

The sixth issue is a question of the application of the special relief provisions of the Revenue Act of 1918 to the computation of the

taxes for the fiscal year 1918. It does not appear from the record that it is impossible to compute the invested capital of the petitioner, or to determine the respective values of the several classes of properties, or that there are present in this case any abnormal conditions which work upon the petitioner an exceptional hardship. The respondent is therefore sustained.

Reviewed by the Board.

*Decision will be entered under Rule 50.*

LOVE concurs in the result only.

PHILLIPS, dissenting: I can not agree with the method used in the majority opinion in computing earned surplus for invested capital purposes. By section 326 (a) of the Revenue Act of 1918 invested capital is defined to include:

(1) Cash paid in for stock or shares;

(2) Cash value of tangible property paid in for shares;

(3) Paid-in or earned surplus;

(4) Cash value of intangible property paid in for shares.

There are certain limitations with which we are not now concerned. There is one, however, which lies at the base of the present controversy. Section 331 provides that in the case of a change of ownership of a trade or business, or of property, after March 3, 1917, if an interest or control of 50 per centum or more remains in the previous owners and such owners are not corporations, then any asset transferred or received from such previous owner shall, for the purpose of determining invested capital, be taken at its cost of acquisition to the previous owners.

The question involved in the instant case may be more easily understood if a less complicated but comparable set of facts be stated. Assume that A owned a patent which he had perfected at a negligible cost. After March 3, 1917, he transferred it to X corporation, which issued therefor all its capital stock to A. At the time of the transfer the patent had an actual cash value of $16,000 and a remaining life of sixteen years. X corporation immediately leased the patent for a royalty of $4,000 per annum. Out of such royalty, which is its only income, X corporation sets up a depreciation reserve of $1,000 per annum and distributes the remaining $3,000 per annum to its stockholders.

At the end of the first year the patent, after deducting the depreciation reserve, will be carried as an asset at $15,000 and X corporation will have $1,000 in cash. Each succeeding year will see the patent value reduced by $1,000 and an increase in cash of a cor-

responding amount. At the end of the sixteen-year life of the patent, X corporation will have $16,000 in cash but no patent.

By reason of section 331 the patent can not be included in invested capital except at its cost to A, which was nominal. It therefore follows that for the first year X corporation has no invested capital. Is this also true for the succeeding years?

Except for the provisions of section 331, the patent could have been included in invested capital at $16,000. The phrase which excludes it is that the value of " any asset so transferred " shall be taken at cost to the previous owner. The limitation applies only to the asset transferred and not to the proceeds which may be realized from its sale or set aside from earnings to cover its exhaustion. In either such case the asset in question has been sold, in whole or in part, and the purchase price remains in the business, either in the form of cash or other assets. The limitation on the asset sold does not apply to the new asset and invested capital should be so computed as to include the cost of this new asset—not the value at which the old asset could have been included. Reading sections 326 and 331 together, it seems to me that the limitation imposed by 331 applies only so long as the corporation continues to hold the asset received from the former owner, and has no application when such asset is disposed of and the proceeds reinvested.

It may be taken for granted that before a corporation can have earnings or an earned surplus, provision must be made to keep its capital intact. But before this may be done, we must know what this capital is and what amount it is that we must make provision to recover out of earnings. The base may vary under different circumstances and for different purposes. The difficulty in computing invested capital in the case before us, or in the case stated above, lies in the different values or bases assigned the assets in question for different purposes. For one purpose their value is fixed at their cost to a preceding owner; for another purpose, at their value when received by the corporation. Some idea of the varying bases which are used in the income-tax acts for different purposes may be gathered from reading section 202 as it appears in the Revenue Acts of 1921, 1924, and 1926 and pondering upon the changes made.

Where, as here, the statute limits the amount at which an asset may be included in capital and in the same section provides for the inclusion of earned surplus, I am of the opinion that a proper construction of the statute requires that earned surplus be computed upon a basis consistent with the capital value used.

In computing earned surplus for invested capital purposes, the earnings need only be reduced by a depreciation reserve sufficient to recover the value assigned to capital assets for the same purpose,

and we need have no regard for the value which may be assigned such capital assets for other purposes. In the case stated at the beginning of the opinion, the patent is allowed no value for invested capital purposes; there is no capital value to be recovered and, in computing earned surplus for invested capital purposes, earnings are not to be reduced to provide a reserve for depreciation or exhaustion. The fact that the patent has a different capital value for a different purpose and that a reserve for depreciation or exhaustion of such value is necessary for such other purposes is immaterial, in my opinion. I should compute invested capital, contrary to the conclusion reached in the majority opinion, upon the theory that earned surplus was to be computed consistently with the basis of value assigned to capital assets for invested capital purposes. In the theoretical case stated at the beginning of the opinion, my conclusion would be that X corporation had invested capital of $1,000 for the second year, $2,000 for the third, and $16,000 for the year after the life of the patent had expired. I recognize that in commercial accounting it would be considered that X corporation had no earned surplus at any time, but this is only because in such accounting it had at all times a capital of $16,000 which it was bound not to impair. For invested capital purposes it had no capital, and therefore its earnings were all a part of its earned surplus or undivided profits. I believe that this situation was recognized and is covered by article 844 of Regulations 45, quoted in the prevailing opinion. I do not consider *Willcuts* v. *Milton Dairy Co.*, 275 U. S. 215, as having considered the question now before us. Nor is the conclusion which I reach contrary to *LaBelle Iron Works* v. *United States*, 256 U. S. 377. No increased value is assigned to the patent. Either one of two things has happened, depending upon the approach made to the question. The patent, which had no value for invested capital purposes, has been realized upon by a sale of a portion thereof (*Ludey* v. *United States*, 274 U. S. 295) and the proceeds are represented by cash, or there have been earnings which go into invested capital *in toto* as earned surplus, without any reduction for exhaustion of an asset having no value for invested capital purposes.

So far I have discussed a stated case in which the reserve for depreciation or exhaustion of capital assets was held in cash, where there was only one asset and where that asset had no value for invested capital purposes. But this has been only to simplify the problem presented. It is immaterial that the reserve set up out of profits may not be in cash but may be reinvested in other assets of the company, or that there were many depreciable assets instead of only one, or that, instead of no value, such assets had a substantial

value but nevertheless a value less for invested capital than their actual value when received. The principle is the same. In computing earned surplus for invested capital purposes, earnings should be reduced only by an amount sufficient to keep intact the value at which the capital assets are included in invested capital, and not by an amount necessary to keep some other value unimpaired. To the extent that the reserve for depreciation exceeds an amount necessary to keep the original invested capital unimpaired, it is a part of the earned surplus to be used in computing invested capital. For these reasons I disagree with the conclusion reached upon what is termed the fourth issue in the prevailing opinion.

McMahon agrees with this dissent.